UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 09-23691-CIV--SEITZ/O'SULLIVAN

AMERICAN HOME ASSURANCE
COMPANY,

    Plaintiff,

v.

PENINSULA II DEVELOPERS, INC.,
et al.,

    Defendants.

v.

WESTCHESTER FIRE INSURANCE
COMPANY, et al.,

    Third Party Defendants.

_____/

## ORDER GRANTING PENINSULA II'S MOTION ON CHOICE OF LAW AND DENYING AMERICAN HOME'S, LANDMARK'S AND WESTCHESTER'S MOTIONS ON CHOICE OF LAW

THIS MATTER is before the Court on American Home Assurance Company's Motion For Determination Of Choice Of Law [DE-89], Landmark American Insurance Company's Motion For Determination Of Choice Of Law [DE-92], Joinder of Westchester Fire Insurance Company To American Home Assurance Company's Motion [DE-93] and Development Peninsula II Developers, Inc.'s Motion For Partial Summary Judgment[1] [DE-94]. This is an action for declaratory judgment in which Plaintiff American Home Assurance Company

---

[1] While American Home has styled its Motion as a "Motion For Partial Summary Judgment," the Court's decision does not grant or deny partial summary judgment to any party as it only determines the law that governs the policies at issue and, at this stage, is not intended to dispose of any of the claims raised in the pleadings.

1

("American Home") seeks a judgment declaring that it has no obligation to defend or indemnify the three Defendants, a condominium developer, its contractor and its drywall subcontractor, for claims brought against them by condominium residents and a condominium association concerning the installation of Chinese-sourced drywall ("Underlying Claims"). All three Defendants have filed Third-Party Complaints against the issuers of the first and second layer umbrella liability coverage, claiming that both excess insurers also have a duty to indemnify the Defendants for the Underlying Claims.

The Parties have elected to bifurcate the litigation of this action, and wish to resolve the matter of whether Florida or California law governs the insurance policies at issue before litigating the remaining issues. The Parties have taken discovery limited to the choice-of-law issue and fully briefed their positions as to which state's law should govern. Additionally, the Court held a hearing on the Parties' cross-motions on August 19, 2010. Having fully considered the record, arguments of counsel and applicable law, the Court finds that, despite California's limited connection to the underlying events, the law of the forum state dictates that California law governs the insurance policies at issue in this case.

I.  **BACKGROUND FACTS**

This action arises out of the construction of the Peninsula II Condominium ("Project") in Aventura, Florida. The developer of the Project, Peninsula II Developers, Inc. ("Peninsula II"), obtained insurance for the construction of the Project for itself, its contractor, Gryphon Construction, LLC ("Gryphon") and its subcontractors, including Defendant Skyline Systems, Inc. ("Skyline"). In doing so, Peninsula obtained an Owner Controlling Insurance Program ("OCIP") that included commercial general liability coverage issued by Plaintiff American Home

Assurance Company ("American Home"). (DE-90-1, Declaration of Laura Candiano ("Candiano Dec.") at ¶ 4). American Home ultimately issued three commercial general liability policies to Peninsula covering construction of the Project, with a combined term of May 15, 2005 to March 30, 2008. (Candiano Dec. at ¶ 2; DE-90-2 through DE-90-4). Peninsula is listed as the "named insured" on the first page of each of the policies, but on the "Name Insured Endorsement" pages, Gryphon and Skyline are also identified as insureds. (*See, e.g.,* DE-94-9 at ARSW 00292, ARSW 00344).[2] The policies do not specify the governing state law.

Chinese drywall was installed throughout the majority of the Condominium, causing property damage within the Condominium and possibly causing bodily injury to third-party owners of Condominium units. (Peninsula II's Third-Party Complaint at ¶ 15). Peninsula II has received notice of claims pursuant to Fla. Stat. § 558[3] from unit owners and the Peninsula II Homeowners' Association for property damage and bodily injury caused by the Chinese drywall. (*Id.*). Upon learning about the installation of Chinese drywall, or in response to the Underlying Claims, Peninsula II has undertaken a program to replace the Chinese drywall and repair property damage to units in the Condominium owned by either Peninsula II or third parties. (*Id.* at ¶ 16). Peninsula II estimates that the cost of this work will exceed $15 million and that additional damages from "carrying and administrative costs" will exceed $5 million. (*Id.* at ¶¶ 16-17).

---

[2] The Named Insured Endorsement page says that the term "Named Insured" includes "[a]ll contractors and/or subcontractors/consultants and/or subconsultants for whom the owner or owner's agent are responsible to arrange insurance to the extent of their respective rights and interests." The Parties do not dispute that, under this provision, Gryphon and Skyline are insured parties. (DE-94-9, ARSW 00344).

[3] Under Fla. Stat. § 558.003 and § 558.004, a plaintiff is not to file an action concerning a construction defect without giving 120 days written notice to an association representing more than 20 parcels, or 60 days written notice to any other putative defendant. Those statutes also provide for a comprehensive alternative dispute resolution scheme that claimants and putative defendants must follow before filing an action with respect to the alleged construction defect.

The instant litigation began on December 11, 2009 when American Home filed a single-count Complaint seeking a declaratory judgment that it did not owe a duty to defend or indemnify any of the Defendants on the Underlying Claims. The Defendants have all filed Third-Party Complaints [DE-22, DE-78, DE-80] against Westchester Fire and Landmark seeking a judgment declaring that Westchester Fire and Landmark both owe a duty to indemnify under their policies "with respect to suits and claims related to Chinese drywall installed in the Peninsula II Condominium." (Peninsula II's Third-Party Complaint at ¶ 34).[4]

The Parties proposed, and the Court has adopted, a case management schedule whereby the Parties would first conduct discovery on, and have the Court resolve, their choice-of-law dispute, then proceed to the merits. The Parties have completed focused discovery and briefing on the choice-of-law issue, and it is now ripe for determination.

## II.   ANALYSIS

As the Court has obtained jurisdiction through diversity of citizenship, it "is bound to apply the substantive law of the state in which it is located," which includes "a state's law regarding choice of laws." *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 (11th Cir. 1990). Accordingly, the Court must determine which state's substantive law the Supreme Court of Florida would choose to govern the interpretation of the policies and it is "bound to decide the case the way it appears [that Court] would." *Towne Realty, Inc. v. Safeco Ins. Co. of America*, 854 F.2d 1264, 1269 n.5 (11th Cir. 1988).

---

[4] The Court entered an Order [DE-97] on June 28, 2010 staying the action as to Landmark after finding that the Complaint and Third-Party Complaints did not contain allegations that any Underlying Claim against Peninsula II had been resolved, let alone enough Underlying Claims to exhaust the nearly $30 million in coverage available to the Defendants under the American Home and Westchester Fire policies.

The Parties disagree not only on which state's law governs the policies, but on the analysis the Court should employ in determining the applicable law. American Home claims that Florida law governs the policies, regardless of whether Florida courts require application of the law where the risk is located or, alternatively, under *lex loci contractus* principles, the law of place where the contract was executed. First, American Home argues that if the policy is governed by law of the site of the insured risk, Florida law must govern because the Project is located in Aventura, Florida and the three insureds are all Florida business entities. American Home claims that if the Court follows *lex loci contractus*, Florida law still governs because American Home took the last act necessary to complete the contract by delivering the insurance binder to Florida.

Defendants, on the other hand, argue that California law governs the policies because Florida courts follow *lex loci contractus* in determining the law that applies to an insurance policy with no choice of law clause and do not consider the location of the risk. Defendants claim that the last act necessary to form the insurance contract between Peninsula and American Home took place in California, the state where Peninsula's insurance broker's agent accepted American Home's offer to provide insurance by directing American Home to bind coverage. Defendants further argue that if American Home's delivery of a written binder constituted acceptance of a counteroffer, California law must still apply because American Home's underwriter delivered the binder to Peninsula's representative in California.[5]

---

[5] Because "Westchester agrees [that] [a]n independent choice of law analysis is not necessary for the Westchester policy," the Court will apply the same substantive law to the Westchester policy as to the American Home policies. (*See* DE-100 at page 2).

5

Thus, the first issue to address is the appropriate choice-of-law analysis to apply in this case. As discussed below, an analysis of the pertinent Florida Supreme Court decisions leads to the conclusion that the Court must apply a *lex loci contractus* analysis. Applying *lex loci* principles to the facts of this case, the Court must apply California law to the policies at issue.

1. **Choice-Of-Law Rule**

Given the numerous and somewhat contradictory authorities pertinent to Florida's choice-of-law test for an insurance contract covering a stationary risk, resolution of the matter was not a simple task. A review of these authorities is necessary to explain the Court's decision. Florida courts resolving contract-interpretation disputes have traditionally applied the doctrine of *lex loci contractus*, requiring a court to follow the law of the state where the contract was made or to have been performed in interpreting the contract. *See Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 (11th Cir. 1990); *see Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (Fla. 1988) (*lex loci contractus* applied in automobile insurance policy dispute); *Lumbermens Mut. Cas. Co. v. August*, 530 So. 2d 293, 295 (Fla. 1988) (*lex loci contractus* applied in uninsured motorist policy dispute). In *Sturiano*, the first case in which the Supreme Court of Florida addressed the proper choice of law analysis for an insurance contract, that court acknowledged that while the "trend of courts around the nation" was to abandon *lex loci* in favor of the Restatement of Conflict of Laws's "significant relationships" test,[6] the inflexibility of the *lex loci* rule promoted "stability in

---

[6] This test, as stated in the Restatement (Second) of Conflict of Laws § 188 (1971), provides as follows:

§ 188. Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

contract arrangements," particularly in a "migratory, transitory society," and the parties to an insurance contract benefit from the *lex loci* rule because they can reasonably expect the law of the jurisdiction in which the contract was executed to govern their agreement. *Id.* at 1130. ("In the case of an insurance contract, the parties enter into that contract with the acknowledgment that the laws of [the] jurisdiction [in which the contract was executed] control their actions.") So, even though *Sturiano* expressly limited its ruling to the auto insurance context, *id.*, the court clearly expressed a general acceptance of *lex loci* in spite of a noticeable trend in other jurisdictions in favor of a most significant relationships test.[7]

Having said that, Florida courts have departed from the rule of *lex loci contractus* in at least two limited circumstances. First, under a "public policy exception," the Florida Supreme Court has recognized that Florida courts can depart from *lex loci* "for the purpose of necessary protection of [Florida] citizens [and to enforce] some paramount rule of public policy." *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1164 (Fla. 2006). Second, Florida courts have exhibited a willingness to depart from *lex loci* with respect to contracts conveying an

---

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contract,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract,
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

[7] Justice Grimes and Overton concurred in the result only, agreeing with the "emerging consensus" that the most significant relationship test should apply because "contractual disputes arise in such a great variety of settings [that] rules of broad application cannot do justice to the various interests and expectations involved." 523 So. 2d at 1130.

7

interest in real property. *See Xanadu of Cocoa Beach Inc. v. Zetley*, 822 F.2d 982, 985 (11th Cir. 1987) ("In Florida, ... the validity of a contract to convey an interest in real estate is governed by the law of the state in which the real estate lies.") (*citing Connor v. Elliot*, 85 So. 164 (Fla. 1920)). This is not to say, however, that Florida courts have ever departed from *lex loci* with respect to an *insurance contract* covering a risk tied to real property.

Based partly on the second exception described above, the Eleventh Circuit Court of Appeals has until recently taken the position in diversity cases that Florida courts would eschew *lex loci* for general commercial policies covering a stationary risk such as a building or construction project, and would apply Florida law when the risk was located in Florida. First, in *Shapiro*, the Eleventh Circuit held that Florida law should govern a general liability policy executed in California that covered a nightclub chain, including a club in Florida where the events leading to the underlying actions took place. After acknowledging that Florida generally applies "the archaic *lex loci contractus* rule" to determine the governing law of a contract, the Court found that Florida would follow Restatement (Second) of Conflicts of Laws § 193, which provides as follows:

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties....[8]

The Court based its decision on Florida's application of the law of the situs of the property in disputes centered on real property, its trend toward adoption of the Restatement (Second) to

---

[8] In their *Sturiano* concurrence, Justices Grimes and Overton opined that §193 should have provided the proper choice of law rule in that case.

resolve choice of law disputes for other causes of action, and the significance of Florida's interest in the outcome of the case. *Shapiro* also distinguished the line of Florida cases applying the *lex loci* to auto insurance policies, finding those cases were grounded in *Sturiano*'s emphasis on the fact that automobiles can easily be moved from state to state, while real estate is "stationary and immobile."

Next, in *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511 (11th Cir. 1997), the Eleventh Circuit briefly revisited *Shapiro* in a dispute over general liability policies covering a toxic waste dump in Tampa. The last act necessary to complete the contracts took place in Texas. LaFarge, the company that managed the dump site, argued that a decision by the Florida Supreme Court holding that the *lex loci* rule applied to a dispute over a life insurance policy undermined *Shapiro*. The Court disagreed and followed *Shapiro* by applying law of the situs, explaining that the Florida Supreme Court applied *lex loci* to life insurance policies because the insured risks in such policies are mobile, just as with an auto insurance policy.

Finally, in *Great Am. E&S Ins. So. v. Sadiki*, 170 Fed. Appx. 632 (11th Cir. 2006), the Court stood by *Shapiro* and *LaFarge* and declined to certify to the Supreme Court of Florida the question of whether a policy executed in another state providing coverage for real estate in Orlando was subject the *lex loci* rule. At the conclusion of its brief opinion, the Court stated that "[o]nce a panel of this Court has settled on the state law to be applied in a diversity case, the precedent should be followed by other panels ... absent a subsequent state court decision or statutory amendment which makes this Court's decision clearly wrong." *Id.* at 634 (quotation omitted). The Court declined the request to certify, having found "[a]fter a careful consideration of the Florida case law ... [that] we cannot conclude that the Florida courts have given a clear

indication that this court's decisions in *LaFarge* and *Shapiro* were wrong." *Id.*

However, in 2006, the Supreme Court of Florida issued an opinion in *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160 (2006). Because of this decision, in 2008, the Eleventh Circuit certified to the Supreme Court of Florida the question of whether *Shapiro* is still good law.[9] In *State Farm*, the Florida Supreme Court had to decide whether Indiana residents who executed an auto insurance contract in Indiana with their local State Farm agent could still invoke Florida's public policy exception to the *lex loci* rule in order to invalidate an exclusionary clause. The court held that the insureds could not invoke the public policy exception because the exception was only available to permanent Florida residents.

While the holding in *Roach* would not ostensibly appear to cast doubt on the validity of *Shapiro*, the *Roach* court's emphatic and broad acceptance of *lex loci* in the insurance contract context, and the notable absence of any discussion about an exception for insurance contracts covering stationary risks in the collective opinions, suggested that the Florida Supreme Court would not adopt the *Shapiro* exception to the *lex loci* rule. The court acknowledged that it had adopted the Restatement approach for other causes of action, but reaffirmed its adherence to *lex loci* in the contract context:

[I]n determining which state's law applies to contract, we have long adhered to

---

[9] In *United States Fid. & Guar. Co. v. Liberty Surplus Ins. Co.*, 550 F.3d 1031 (11th Cir. 2008), the Eleventh Circuit Court of Appeals certified the following question to the Supreme Court of Florida:

DOES THE DOCTRINE OF *LEX LOCI CONTRACTUS* APPLY TO A DISPUTE ABOUT COVERAGE THAT INVOLVED A POLICY FOR COMPREHENSIVE GENERAL LIABILITY INSURANCE, MADE OUTSIDE OF FLORIDA, THAT INSURES THE OPERATIONS OF A CONTRACTOR ON A PROJECT IN FLORIDA?

However, the parties stipulated to a dismissal of the appeal, depriving the Supreme Court of Florida of an opportunity to provide further guidance on this issue.

> the rule of lex loci contractus. That rule, as applied to insurance contracts, provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage. In *Sturiano*, we considered – and rejected – the significant relationships test.

945 So. 2d at 1163. The court went on to discuss only *one* recognized exception to the rule for insurance contracts – the public policy exception – and never recognized an exception for stationary risks. Finally, while Justice Pariente's and Justice Lewis's concurring opinions question the majority's failure to acknowledge how earlier cases focused on the extent to which the insurer had notice of the location of the insured risk, both fail to mention either *Shapiro* or the impact of the majority opinion on any kind of exception for stationary risks.

Moreover, having thoroughly reviewed the cases the Parties provided and having conducted its own research, the Court is not aware of any Florida authority acknowledging or implying the existence of a *lex loci* exception for stationary risks. Neither the Court nor the Parties have identified any Florida cases positively referencing the *Shapiro* line of cases or the Restatement test they adopt. In fact, the only Florida opinion to cite Restatement (Second) § 193 is the *Sturiano* concurrence discussed above in notes 7 & 8, *infra*, which the *Sturiano* majority rejected in adhering to *lex loci*. Furthermore, the *Roach* opinion, which firmly states that the *lex loci* rule applies to all insurance contract disputes and limits the sole recognized public policy exception to that rule, substantially undermines *Shapiro*'s prediction that the Florida Supreme Court is willing to recognize exceptions to that rule in contracts insuring risks adhering to real property. It is no surprise, then, that in the post-*Roach* world, a number of federal district courts in Florida have applied the *lex loci* rule in cases where the parties' disputes arise under general commercial policies covering a construction project, a building or real estate. *See USF&G*, 2007

11

U.S. Dist. LEXIS 77004 (S.D. Fla. Oct. 15, 2007); *Valiant Ins. Co. v. Progressive Plumbing, Inc.*, 2007 U.S. Dist. LEXIS 75100 (S.D. Fla. Oct. 9, 2007); *CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*, 505 F. Supp. 2d 1317 (M.D. Fla. 2007).

As a result, while common sense suggests that the law of Florida should apply in this case for numerous reasons – including the facts that the stationary risk is located in Florida, the insured parties are all located in Florida, California has no connection to the suit other than Peninsula's insurance agent's office in Los Angeles, and the action has been complicated because of the need to identify the jurisdiction in which the policies were executed – the Court can only conclude that the Supreme Court of Florida would apply *lex loci contractus* in this case. The concurrences in *Sturiano* and *Roach* championing the Restatement tests have not been adopted in subsequent decisions, and *Roach*'s broad acceptance of *lex loci* with no recognition of an exception for stationary risks suggests the Supreme Court of Florida would not follow *Shapiro* and similar Eleventh Circuit decisions. Accordingly, the Court has analyzed the appropriate governing law under the *lex loci* rule.

2. **Application of *lex loci contractus***

   a. **Background Facts**

To determine the governing law under *lex loci*, the Court has reviewed the events leading up to the execution of the insurance contract. Aon Risk Services, Inc. of Southern California ("Aon California") served as Peninsula's agent in the negotiation and procurement of the American Home policies. (DE-94-1, Declaration of Danette Jones ("Jones Dec.") at ¶ 3). An Aon California employee, Danette Jones ("Jones"), served as Peninsula's insurance representative for the procurement of those policies in 2005. (*Id.*). In that role, Jones had

responsibility for marketing primary and excess coverage, and she negotiated with underwriters on Peninsula's behalf. (*Id.*). Jones negotiated with insurance carriers that bound coverage for Peninsula from her office in Los Angeles. (*Id.* at ¶ 5).

On March 25, 2005, Stephen Buonpane ("Buonpane"), an underwriter for the American Home policies with AIG Construction Risk Management ("AIG") in New York, initiated the negotiation of the policies when he sent an insurance proposal ("Proposal") for the Project by e-mail to Jones at Aon California, copying Brandon Beane ("Beane") at Aon Risk Services, Inc. of Florida ("Florida"). (DE-90-6 at page 2). The Proposal offered coverage for the period April 1, 2005 through April 1, 2007. (DE-20, Proposal at page 3). While it did not present all of the terms and conditions in the finalized policies, it contained numerous specific contract terms, including coverage specification for general commercial liability and an itemization all of the areas of coverage and exclusions provided in the final policies. (*Id.* at pages 12-13). The Proposal was addressed to Peninsula and its "Representative" Aon California. (*Id.* at page 3). After the Proposal was considered by Peninsula and its consultants,[10] Jones, on April 20, 2005, responded by e-mail to Buonpane's transmittal of the Proposal and stated as follows: "I'm pleased to confirm you are authorized to bind coverage for the captioned project effective May 15, 2005 per your [P]roposal...." (DE-90-7).

On May 16, 2005, Buonpane sent an e-mail to Jones, copying Beane, which delivered an executed binder that reflected the revised commencement date, and a binder bill. (DE-90-18).

---

[10] On March 31, 2005, Beane forwarded the Proposal to Fisher Harris Shapiro, Inc. ("Fisher Harris"), a New York consultant that Peninsula engaged to help create the OCIP. (Proposal at page 2). On April 8, 2005, Fisher Harris's Cindy Schwartz ("Schwartz") forwarded the Proposal to Peninsula. (Smolinksy Dec. at ¶ 9; DE-90-21 at page 4). On April 18, 2005, Peninsula instructed Schwartz to move forward with binding coverage effective May 15, 2005 because Peninsula expected a mid-May start for construction. (DE-90-21 at page 1). That same day, Schwartz asked Beane to bind AIG's quote for the Peninsula II OCIP effective May 15, 2005. (DE-90-22).

Buonpane sent a hard copy of the binder via UPS 2nd Day Air on the same date to Jones at her office address in Los Angeles. (DE-90-8, Binder Of Risk Management Program ("Binder") at page 2). The executed Binder outlines the general liability coverage available to Peninsula for the period May 15, 2005 through May 15, 2007. (*Id.* at page 5). The Binder also provides on its title page that the Binder is for Peninsula and Aon California. (*Id.* at page 4). A written binder is often issued to confirm bound coverage after coverage has been accepted. (Jones Dec. at ¶ 4).

Per industry custom, American Home subsequently mailed policy forms to Peninsula to replace the Binder, and the forms contained the same terms and conditions provided in the Proposal and Binder.[11] (*Id.*). American Home's underwriter sent the policy forms to Aon California, who then forwarded them on to Aon Florida. (*See, e.g.,* DE-90-2 at pages 1-2; DE-94-16). Finally, while Peninsula entered into an OCIP Service Agreement ("OCIP Agreement") with Aon Risk Services, Inc. of Florida ("Aon Florida"), which became effective May 15, 2005, the OCIP Agreement was not executed until January 10, 2006, almost eight months after the delivery of the Binder. (DE-90-16, OCIP Agreement at page 13).

   b.   **Analysis**

Under *lex loci contractus*, "in the absence of a contractual provision specifying the governing law, a contract (other than one for the performance of services) is governed by the law of the state in which the contract is made, *i.e.*, where the last act necessary to complete the

---

[11] For example, the Proposal provides for the following limits: $2,000,000 for each occurrence of bodily injury or property damage, a $4,000,000 general aggregate limit and a $4,000,000 product-completed operations aggregate limit. (Proposal at 12). It lists eighteen forms extending or defining coverage, and thirteen separate exclusions. (Proposal at 12-13). The Binder lists the same limits, the same forms extending or defining coverage, and the same thirteen exclusions. (Binder at 11-12). The policies provide the same limits, coverage and exclusions. (*See, e.g.,* DE-90-2, 5/15/05 through 5/15/06 American home policy, at page 5 (providing limits) and pages 30 through 65 (endorsements)).

contract is done." *Fioretti v. Massachusetts Gen. Life. Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995). Determining where the last act necessary occurred in any particular case is a fact-intensive inquiry. *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004).

Defendants argue that California law governs the policies because Jones acted as Peninsula's agent in negotiating insurance coverage and accepted an offer for that coverage from her office in California. Alternatively, they assert that even if the last act necessary to provide coverage was the delivery of a written binder or policy, California law still must apply because AIG delivered the written binder and original policy forms to Jones in California.

American Home, on the other hand, argues that the last act necessary to complete the policies was American Home's acceptance by delivering a binder to Peninsula in Florida through Peninsula's brokers. According to American Home, Jones's request that Buonpane bind coverage for a term (May 15, 2005 to May 15, 2007) different than the term that Buonpane proposed (April 1, 2005 to April 1, 2007) altered a material term of the agreement. Under this theory, Jones's request was a counteroffer, not an acceptance, and AIG/American Home accepted the counteroffer by delivering the binder. Accordingly, the Parties' dispute centers on whether the last act necessary to execute the agreement occurred in California with Jones's e-mail or upon delivery of the binder, which was transmitted in the same e-mail to California and Florida and delivered in hard copy to California.

Authorities applying the *lex loci* rule, including Florida authorities, conflict as to whether the last necessary act to execute an insurance policy is either (1) the place where an acceptance (or a binder) is received, or (2) the place from where the acceptance (or a binder) is sent. At least

15

two Eleventh Circuit Court of Appeals decisions follow the first approach. For example, in *Prime Ins. Synd., Inc. v. B.J. Handley Truck, Inc.*, the Eleventh Circuit held that Alabama law applied to a policy where the insurance company (apparently located in Illinois) took the last act necessary to execute a contract by communicating an oral binder with a company residing in Alabama because the insured received acceptance of the oral agreement in Alabama. *Prime Ins. Synd., Inc. v. B.J. Handley Truck, Inc.*, 363 F.3d 1089, 1092-93 (11th Cir. 2004). Similarly, in *Industrial Chem. & Fiberglass Corp. v. The North River Ins. Co.*, 908 F.2d 825, 829 n.3 (11th Cir. 1990), the Eleventh Circuit held that the last act necessary to the execution of a policy was "the receipt and acceptance of the policies by the named insured, [which] took place in New York." 908 F.2d 825, 829 n.3 (11th Cir. 1990).[12]

On the other hand, other Florida authority states that an acceptance is effective, and the last act to execute a contract occurs, in the location where the acceptance was made or transmitted. For example, in *CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*, 505 F. Supp. 2d 1317, 1321 (M.D. Fla. 2007), the court held that New York law should apply to an insurance policy when the binder was sent from New York to Florida because "[u]nder Florida law, the important factor is the place of execution of the contract, not the place or places to which it was eventually mailed." Moreover, the *CNL* court found that the delivery of the contract to Florida and the riders' specific to Florida law were not relevant in its *lex loci* analysis. *Id.* at 1320. This approach follows the Restatement's position that a contract is made at the time an acceptance

---

[12] Some Florida state cases follow this approach. *See, e.g., Bloch v. Berkshire Ins. Co.*, 585 So. 2d 1137 (Fla. DCA 3rd 1991) (insurance contract that plaintiff received in New York "where he then resided, was regulated by New York, rather than Florida, law"). *Prime*, *Industrial*, and *Bloch* follow the approach of at least one insurance law treatise that "[a] contract of insurance is ordinarily complete and closed when the binder is signed and delivered." *In re: The Celotex Corp.*, 194 B.R. 668 (M.D. Bankr. 1996) (quoting 12 A Appleman & Appleman, Insurance Law and Practice, division 8, pt. 50, ch. 263A, sec. 7228 (1981)).

leaves the offeree's possession. Restatement (Second) Contracts § 63 (1979) ("an acceptance made in a manner and by a medium invited by an offerer is operative and completes the manifestation of mutual assent as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror"); *see also, Pezold Air Charters v. Phoenix*, 192 F.R.D. 721 (M.D. Fla. 2000) ("An acceptance is effective when, and thus where, dispatched.").

However, in this case, the Court need not choose between the two approaches because neither would permit the application of Florida law, and California law must apply. Here, the undisputed evidence is clear that Jones, working in California, was acting as Peninsula's agent in negotiating the policy with American Home's agent. Not only has Jones submitted an undisputed affidavit averring that she served as Peninsula II's agent and conducted all of her work in this matter in California, but all of the documents the Parties exchanged identify Aon California as Peninsula's agent. As a result, because the policies were executed in the exchange between American Home's agent in New York and Peninsula II's agent in California, the last act could not have occurred in Florida.[13] Following the "binder received" approach, the policies are governed by California law because the binder was clearly directed to Jones in California, who was Peninsula's designated agent for procuring general commercial liability insurance even if

---

[13] Moreover, under *lex loci*, because a "contract is created where the last act necessary to make a binding agreement takes place," *D.L. People Grp., Inc. v. Hawley*, 804 So. 2d 561, 563 (Fla. 1st DCA 2002), the Court is to focus on the jurisdiction where the execution of the contract took place, and a contract should not be deemed to be executed in the state where a party resides if that party's agent undertakes the last act in a different state. *See, e.g., Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1232 n.14, 1236 (11th Cir. 1995) (New Jersey law governed life insurance policy when New York insured executed statement of good health in New Jersey and insurance company's headquarters was in Colorado); *In re" The Celotex Corp.*, 194 B.R. 668, 673 (Bankr. M.D. Fla. 1996) (applying Illinois law to Florida debtor's contracts with various insurance companies because "the law is clear that delivery of the binders of insurance to the particular *agents* in Illinois is sufficient to bind all the parties and ... to be the final act required to secure coverage") (emphasis added); *Insights Trading Grp., LLC v. Federal Ins. Co.*, 2010 U.S. Dist. LEXIS 67271, at *10 (D. Md. Jul. 7, 2010) (New York law governed insurance policies because insured's agent received the policies in New York, even though insured resided in Maryland).

American Home's underwriter copied an Aon Florida employee when he transmitted the binder electronically.

Alternatively, following the "acceptance made" approach, if Jones's April 20, 2005 e-mail was an acceptance, then obviously that acceptance was made in California and the polices are governed by California law. If Jones's April 20, 2005 e-mail was a counteroffer, Florida still would not govern under this approach. The governing law would be either California law because the binder was delivered in that state, or New York law, where American Home's acceptance to the counteroffer was made. However, none of the Parties have argued that New York law should apply in this matter[14] and, as an argument in favor of New York law is not before the Court and insurance treatises have suggested that an insurance contract is executed upon delivery of a binder, see note 12, infra, the Court would apply California law to the American Home and Westchester policies even if Jones's e-mail was a counteroffer because Jones received the binder in Los Angeles. Accordingly, having carefully considered the Motions, it is hereby

ORDERED THAT

(1) American Home Assurance Company's Motion For Determination Of Choice Of Law [DE-89] is DENIED.

(2) Westchester's Motion [DE-93] in support of American Home's Motion is DENIED.

(3) Peninsula II Developers, Inc.'s Motion For Determination Of Choice Of Law [DE-94] is GRANTED.

---

[14] The Parties' briefs did not address whether New York law should apply and counsel stated at oral argument that none of the Parties are claiming that New York law applies in this case.

(4) Landmark American Insurance Company's Motion For Determination Of Choice Of Law [DE-92] is DENIED without prejudice because all proceedings against Landmark have been stayed.

DONE and ORDERED in Miami, Florida this 19th day of October, 2010.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:
Counsel of Record