IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-CV-23691-SEITZ-O'SULLIVAN

AMERICAN HOME ASSURANCE COMPANY,
a New York Corporation

       Plaintiff / Counterclaim Defendant,

v.

PENINSULA II DEVELOPERS, INC., a Florida
corporation, GRYPHON CONSTRUCTION, LLC,
a Florida limited liability company, and SKYLINE
SYSTEMS, a Florida corporation,

       Defendants / Counter-Plaintiff /
       Third-Party Plaintiff,

WESTCHESTER FIRE INSURANCE COMPANY, a
New York corporation, and LANDMARK AMERICAN
INSURANCE COMPANY, an Oklahoma corporation,

       Third-Party Defendants.
_____/

**PENINSULA II DEVELOPER INC.'S RESPONSE AND MEMORANDUM OF LAW
IN OPPOSITION TO THIRD-PARTY DEFENDANT WESTCHESTER FIRE
INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   INTRODUCTION .............................................................................................. 1

II.  MATERIAL FACTS ......................................................................................... 3

III. LEGAL STANDARD AND INSURANCE LAW PRINCIPLES ....................... 7

IV.  ARGUMENT .................................................................................................... 8

A.  Peninsula II is entitled to coverage under the broad grant of coverage provided by the
    OCIP polices. ................................................................................................ 8

    1.  Peninsula II has met its burden of establishing coverage. ........................... 8
    2.  Because the primary layer is exhausted, the first excess layer provided by
        Westchester is now triggered. ............................................................... 10

B.  Westchester's Policy Provides Coverage for the Damages at Issue; Westchester cannot
    meet its Burden of Proving that an Exclusion Applies. ....................................... 11

    1.  The OCIP Policies Provides Coverage. ................................................... 11
        a.  The Westchester Policy covers Products Claims. ............................... 13
        b.  The Westchester Policy covers Completed Operations Claims. ............. 13
        c.  The Westchester Policy provides Contractual Indemnity Coverage. ....... 15
    2.  The number of occurrences is irrelevant because American Home is paying the
        Aggregate Products Completed Operations limit. ..................................... 15
    3.  Westchester's prematurity arguments fail because the underlying insurance is
        exhausted and the insureds have incurred losses exceeding the amount of underlying
        insurance. ........................................................................................... 16
        a.  Westchester's argument that the claims at issue are premature ignores critical
            policy language and relies on caselaw that is inapplicable. ................... 16
        b.  Repair costs accrue on a daily basis; the total costs are projected to a reasonable
            degree of certainty ............................................................................ 20
    4.  Westchester's Damage to Project Exclusion does not preclude coverage:  the damages
        at issue are covered as products claims, completed operations and under the policy
        provision for contractual indemnity coverage. ......................................... 21
    5.  Other Exclusions relied upon by Westchester are equally unavailing and do not
        preclude coverage. ............................................................................... 23
        a.  Exclusion j(1) does not apply to damage to third party owned units and does not
            apply to Gryphon and Skyline at all. ................................................. 23
        b.  Exclusion j(6) expressly does not apply to completed operations claims and
            therefore does not apply here. ........................................................... 24
        c.  Exclusion j(6) does not bar Peninsula II's damages for carrying costs and lost
            profits. ........................................................................................... 24

C.  Westchester is not entitled to summary judgment on any obligation for defense costs. .. 28

        a.  Defense costs paid by American Home are not subject to summary judgment.... 29
        b.  Matco, SDM, WJE consultants fees are not "defense costs" .............................. 29
        c.  Repair costs are not defense costs ........................................................ 30

V.   CONCLUSION ............................................................................................... 30

402974938

Peninsula II Developers, Inc. ("Peninsula II"), submits this memorandum of law in opposition to Third-Party Defendant Westchester Fire Insurance Company's ("Westchester") motion for summary judgment.

## I.     INTRODUCTION

This is an insurance coverage action in which the parties seek declaratory relief concerning their respective rights and obligations with respect to property damage claims arising out of the existence of Chinese Drywall ("CDW") in a condominium project in Aventura, Florida.  The action was initiated by plaintiff, American Home Assurance Company ("American Home"), which issued the primary or first layer of general liability coverage in the Owner Consolidated Insurance Program ("OCIP") covering the project.  Peninsula II, the developer of the project, Gryphon Construction, the general contractor, and Skyline Systems, the drywall subcontractor who supplied and installed CDW, are all insureds under the policies issued in connection with the OCIP.

While each insured is treated separately for coverage purposes (*e.g.* claims by one insured against another are covered), the limits available under each policy are shared.  American Home has now agreed to pay a full products-completed operations aggregate limit to indemnify Peninsula II, Gryphon and Skyline from CDW property damage claims at the project.  American Home has also agreed to reimburse defense costs incurred by those three insureds to defend against CDW property damage claims through June 2, 2011.  As such, American Home has exhausted its coverage obligations with respect to these claims.  The focus of the action, therefore, is now on third-party defendant Westchester, which issued the first layer of umbrella (excess) coverage under the OCIP for claims involving the project.

1

With some exceptions discussed below, the OCIP general liability policies at issue provide what is relatively standard coverage for contractors, developers and owners. Specifically, the policies cover each insured's legal obligation "to pay damages because of . . . 'property damage'". "Property damage" is defined as physical injury to tangible property or loss of use of tangible property. Accordingly, the basic insuring agreements of the OCIP policies are triggered (and the insureds meet their burden of proof in this litigation) if the insureds demonstrate liability for damages "because of" physical injury to, or loss of use of, any portion of the condominiums by reason of CDW. To our knowledge, there is no dispute that there has been widespread physical injury to, and loss of use of, the project by reason of the existence of CDW. For this reason, there can be no good faith dispute that the insureds can establish a prima facie case for coverage.

In its motion for summary judgment, Westchester has raised a myriad of diverse arguments against coverage in the hope that one might succeed. Westchester bears the burden of proof with respect to most, if not all, of these arguments (insurers bear the burden of proof with respect to the application of an exclusion). As set forth below, most of the contentions raised by Westchester are easily refuted as a matter of law. The remainder raise disputed issues of material fact. None of Westchester's arguments comes close to justifying entry of judgment in its favor at the summary judgment stage.

One additional note at the outset. While defendants Peninsula II, Gryphon and Skyline are each insureds under the policies, they are separate and distinct insureds, with separate and distinct rights to coverage. As noted, Peninsula II developed the project, Gryphon was the general contractor in its construction, and Skyline was the drywall subcontractor who procured and installed the CDW. Although Westchester virtually ignores the outstanding claims against

402974938

Gryphon and Skyline, those claims are critical to an evaluation of the overall coverage available under the OCIP for CDW claims at the project.

For example, Westchester attempts to disclaim coverage by repeatedly noting that there are no third party claims against Peninsula II with respect to units it still owns in the project (and cannot sell until the CDW within them and resulting property damage is addressed). Westchester ignores the critical fact, however, that Peninsula II has made Section 558 claims and filed suit against both Gryphon and Skyline with respect to damages arising out of the CDW in those units. Westchester insures Gryphon and Skyline as well as Peninsula II, and is responsible to indemnify them against liability to Peninsula II. Therefore, whether the Westchester policy covers damages to units still owned by Peninsula II cannot be decided solely by analyzing the coverage available to Peninsula II. To the contrary, Peninsula II's claims for damage to units it owns is clearly covered as a third party claim against Gryphon and Skyline under Westchester's policy. Indeed, American Home treats the payment of its products-completed operations aggregate limit as a resolution of claims by Peninsula II against Skyline – claims which Westchester barely mentions – but which are central to the coverage issues it raises. In short, Westchester's request for entry of a judgment with respect to its coverage obligations, by ignoring claims against its other insureds, cannot be sustained.

## II.    MATERIAL FACTS

The facts material to this motion are stated in the accompanying *Peninsula II's Response to Third-Party Defendant Westchester Fire Insurance Company's Statement of Material Facts*, which is incorporated herein by reference. The essential facts are as follows:

Peninsula II was the developer of the Peninsula II Condominium, a 223-unit luxury condominium project, in Aventura, Florida ("the Project" or "the Condominium"). SOF #

1PEN.  Peninsula II hired Gryphon as the general contractor to construct the Condominium, and in turn, Gryphon hired Skyline as the drywall subcontractor.  SOF # 2PEN.  By contract, Gryphon agreed to indemnify Peninsula II for damages caused by its acts or omissions or those of its subcontractors.  SOF # 3PEN.  In turn, by contract, Skyline agreed to indemnify both Gryphon and Peninsula II for damages caused by its own acts or omissions or the acts or omissions of its drywall suppliers and manufacturers.  SOF # 4PEN.

To insure the Project, Peninsula II set up an Owner Controlled Insurance Program ("OCIP"), sometimes referred to as a "wrap up" program.  SOF # 5PEN.  An OCIP, like that here, typically insures all project participants including the owner, general contractor, and enrolled subcontractors, in an effort to ensure consistency of coverage and limits.  As Westchester's lead underwriter William Schmaltz explained:

> [T]he overriding concept [of an OCIP] is that the owner of a construction project wants to make sure that the coverage they desire is in place for all the contractors that are involved, and therefore one policy is negotiated and purchased, and everyone, the owner, the general contractor, and usually any subcontractors on-site, are all insured in this policy, which gives the owner a considerable amount of comfort in knowing that the coverage is in place.

Response to SOF #34.  *See also* Controlled Insurance Program (CIP)" at http://www.irmi.com/ online/insurance-glossary.

Under the OCIP, American Home issued three consecutive commercial general liability ("CGL") policies covering the Project for the period from May 15, 2005 through March 30, 2008.  SOF #34.   The primary layer of coverage provided limits of $2 million per occurrence and a $4 million aggregate for products-completed operations claims.  SOF #35.  Westchester is the first layer umbrella (excess) insurer and issued one policy covering the project period from May 15, 2005 to 2008.  SOF #37.  Westchester's policy provides $25 million in coverage.  *Id.* Landmark Insurance Company sits excess to Westchester for the same period and provides an

additional $25 million in coverage.  SOF #5PEN. Each layer of coverage also includes a five year completed operations tail.  *Id.*

Each of the OCIP policies insures Peninsula II, Gryphon, and Skyline, and each of the policies provides coverage for Peninsula II, Gryphon and Skyline's legal liability for damages because of property damage at the Peninsula II Condominium.  SOF#6PEN.  Each of the policies also contains a "separation of insureds" provision which means that each project participant is treated as if it is the only insured, and a suit by one insured against another does not defeat coverage.  *Id.* While each insured is treated separately under the policies, however, there is only one set of limits available for each policy which is shared by all insureds. *Id.*

Construction of the Condominium began in January 2005.  SOF #5.  Skyline installed drywall, including Chinese drywall, in individual units between June 2006 and May 2007. Response to SOF #6.  In February 2009, unit owners at the Project began complaining of property damage arising out CDW contained in their respective units.  SOF # 7PEN – 9PEN. The unit owners notified Peninsula II of this damage and served Section 558 notices on Peninsula II demanding that Peninsula II remedy all damages, defects and deficiencies under Florida law.  *Id.* Peninsula II notified American Home, Westchester and Landmark, as well as both Gryphon and Skyline, of these claims and demanded a defense and indemnification.  SOF #9PEN. Shortly thereafter, the Peninsula II homeowners association sent Peninsula II a Section 558 notice for damages associated with the common areas of the Project.  SOF #8PEN. That notice was also forwarded to the insurers and to Gryphon and Skyline for defense and indemnification.  SOF #9PEN. Subsequently, Peninsula II filed suit against Gryphon and Skyline demanding that Gryphon and Skyline indemnify it from and against all property damage arising in connection with the CDW at the Project, including damage to units that Peninsula II still owns

402974938

(and cannot sell by reason of CDW).[1]   Response to SOF#4. Gryphon and Skyline tendered each of the 558 notices, as well as the complaint filed against them by Peninsula II, to American Home and Westchester for coverage.  *Id.*

In response to the homeowner complaints, Peninsula II investigated the claims and ultimately determined that 181 of the 223 units and certain common areas of the Condominium contained CDW which was causing certain metal components within the Condominium to corrode and fail.   Response SOF #10; SOF#10PEN; 13PEN.   In consultation with various experts, Peninsula II developed a comprehensive CDW remediation protocol and began to enter into settlement agreements with residents whereby Peninsula II agreed to repair that property damage.  SOF #19PEN.  Peninsula II reviewed the scope of these Agreements with American Home in August 2010 before the first Agreement was executed.  *Id.*  To date, over $18 million has been incurred to remediate damage by reason of the CDW.  SOF #20PEN.  It is expected that when all the remedial work has been completed, Peninsula II will have incurred over $34 million in costs.  *Id.*  This amount includes defense costs, direct costs of repair, consultant costs, costs to relocate unit owners and/or tenants displaced during remediation to temporary housing, costs incurred by Peninsula II to maintain units which cannot be sold due to the presence of CDW, losses sustained by Peninsula II in an under market bulk sale of certain units that Peninsula II was forced to incur as a result of the CDW, and other losses.  *Id.*

American Home initially provided a defense to Peninsula II for the CDW claims and Westchester reserved its rights.  SOF #16PEN.  On December 11, 2009, however, American

---

[1]  Peninsula II made Section 558 claims and demanded a defense and indemnity from Gryphon and Skyline during 2009.  Those claims were tendered to the OCIP carriers.  Peninsula II delayed filing its Complaint against Gryphon and Skyline until 2011 in the hope that the parties could resolve this dispute without the need for additional litigation.  Because the claims were not resolved amicably, Peninsula II had no choice but to file suit. In any event, Westchester has known of Peninsula II's claims against Gryphon and Skyline for more than two years.

Home filed this action for Declaratory Judgment seeking a declaration that it owed no duty to defend or indemnify Peninsula or the other insureds, Gryphon and Skyline, with respect to the CDW claims.  SOF # 17PEN.  Peninsula II, Gryphon and Skyline filed counterclaims against American Home and third party complaints against Westchester.  SOF # 18PEN.  Westchester answered, denying coverage for the CDW claims.  *Id.*

On June 2, 2011, American Home agreed to pay Peninsula II $1.6 million for defense costs incurred through June 2, 2001, and to pay $4 million in indemnity for CDW property damage claims. SOF # 22PEN.  American Home also agreed to reimburse Gryphon and Skyline for defense costs they have incurred through that date. *Id.*

Under the terms of the settlement agreement and the American Home policy, American Home's payment of $ 4 million reflects a payment of a full products-completed operations aggregate, and thus exhausts its obligations in connection with CDW property damage claims at the Project.  SOF # 23PEN.

### III.   LEGAL STANDARD AND INSURANCE LAW PRINCIPLES

The Court should not grant summary judgment unless it is clear that there are no material facts in dispute such that judgment can be entered as a matter of law.  *Scottsdale Ins. Co. v. Shageer*, 2010 U.S. Dist. LEXIS 126659, *8 (S.D. Fla. Dec. 1, 2010) citing *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 255 (1986), *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  Any doubts in this regard should be resolved against the moving party - - Westchester. *Id.*  At this stage, the court's function is not to determine credibility, weigh the evidence or determine the truth of the truth of the matter but rather determine if there are material facts in issue.  *Id.* at 249, 255.  Thus, summary judgment is not appropriate where, as here, there are

genuine issues of material facts that must be resolved by a fact finder.  *See Shageer*, 2010 U.S. Dist. LEXIS 126659.

Under California law, interpretation of an insurance policy is a question of law, decided under settled rules of contract interpretation.  *See Ameron Int'l Corp. v. Ins. Co. of State of Pennsylvania*, 252 P.3d 1020, 1024 (Cal. 2010).  Courts enforce the clear and explicit meaning of provisions of an insurance policy, interpreted in their ordinary and popular sense.  *See id* at 1024.  To the extent the policy language is susceptible to more than one reasonable interpretation, however, it is ambiguous and that ambiguity is construed against the insurer and in favor of coverage "so as to protect the insured's reasonable expectation of coverage." *Id.*  The insured bears the burden to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage.  *Aydin Corp. v. First State Ins. Co.*, 959 P.2d 1213, 1214 (Cal. 1998).  "[O]nce the insured has made this showing, however, the burden is on the insurer to prove the claim is specifically excluded."  *Id.*

## IV.    ARGUMENT

### A.    Peninsula II is entitled to coverage under the broad grant of coverage provided by the OCIP polices.

#### 1.    Peninsula II has met its burden of establishing coverage.

The American Home primary policy provides coverage to the insured Project participants as follows:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

Westchester Ex. 46 at 5; Ex. 47 at 3; Ex. 48 at 10.  The "bodily injury" or "property damage" must be caused by an "occurrence."  *Id.* The policies define "occurrence" as "an accident,

including continuous or repeated exposure to substantially the same general harmful conditions"[2] while "property damage" is defined as:

      a.     Physical injury to tangible property, including all resulting loss of use of that property … [ or]

      b.     Loss of use of tangible property that is not physically injured . . .

Id. at 19; at 15; at 23. In short, American Home's coverage obligations are triggered where an insured is legally obligated to pay damages "because of" physical injury to or loss of use of tangible property by reason of continuous exposure to substantially the same harmful conditions. Westchester's policy follows form in all respects.

There is no dispute that coverage is triggered here. For example, it is undisputed that CDW caused metal components within the Condominium to corrode (physical injury to tangible property), that Peninsula II has lost the ability to sell units affected by CDW (loss of use of tangible property), or that unit owners need to be relocated during repairs (loss of use). SOF#13PEN; 20PEN. Thus, there is clearly "property damage" by reason of the CDW. Furthermore, Peninsula II, Gryphon, and Skyline all have legal liability for this property damage. Specifically, Peninsula II, as the developer, is legally liable to unit owners for damage to their respective units caused by a construction or product defect. Gryphon must indemnify Peninsula II for the acts, omissions and liabilities of its subcontractors, including Skyline. SOF#3PEN. And Skyline must indemnify Gryphon and Peninsula II for defective products installed in the Condominium - - the CDW. SOF#4PEN. This includes vicarious liability for the negligence of manufacturers and/or suppliers of CDW. Consequently, coverage has clearly been triggered under the basic insuring agreement. Indeed, American Home has agreed to pay a full $4 million

---

[2] The definition of "occurrence" was amended by endorsement to add "In the event of continuing or progressive "bodily injury" or "property damage" over any length of time, such "bodily injury" or "property damage" shall be

402974938

products-completed operations aggregate limit on behalf of Skyline for that liability.   SOF #22PEN.   As explained below, this exhausts the primary layer of insurance and triggers the Westchester excess layer.

> **2.      Because the primary layer is exhausted, the first excess layer provided by Westchester is now triggered.**

American Home's agreement to pay a full $4 million products-completed operations aggregate limit exhausts the primary layer of insurance.   Once the primary layer of insurance is exhausted, Westchester's excess obligations are triggered.   Specifically, under the Westchester insuring agreement, Westchester agrees:

> To pay on behalf of the "Insured" for that amount of loss which exceeds the amount of loss payable by "Underlying Insurance" described in the Declarations [the American Home policy], but the company's obligations shall not exceed the limit of liability stated in Declaration 6.

Westchester Ex. 49 at 2.   Westchester's lead underwriter admitted that "If [American Home] paid $4 million for products/completed operations, their policy would be exhausted."   Response to SOF #36.

Therefore, it should be undisputed that American Home's payment of its $4 million products-completed operations aggregate exhausts the primary layer and triggers Westchester's excess coverage to the extent that loss is in excess of $4 million.   As noted above, Peninsula II has provided an expert report demonstrating more than $34 million of damages because of the existence of CDW at the Project.   Taking into account the payments for both defense and indemnity made by American Home, that damages number is now approximately $28 million, exclusive of interest, attorneys fees and costs. As such, Westchester's policy is triggered and the

---

deemed to be one "occurrence", and shall be deemed to occur only when such "bodily injury" or "property damage" first commenced."  See Westchester Ex. 46 at 45; Ex. 47 at 41; Ex. 48 at 48..

402974938

burden shifts to Westchester to prove that an exclusion precludes coverage.  *Aydin Corp.,* 959 P.2d at 1214.

**B.**     **Westchester's Policy Provides Coverage for the Damages at Issue; Westchester cannot meet its Burden of Proving that an Exclusion Applies.**

**1.**     **The OCIP Policies Provides Coverage.**

As noted above, general liability policies like those issued under the Peninsula II OCIP broadly provide coverage for damage because of property damage, but it is also important to focus here upon three subsets of that broad coverage grant.

First, the policies provide coverage for "products" claims.  Specifically, the policies provide coverage for "all 'property damage' occurring away from premises you own or rent and arising out of 'your product.'"  Westchester Ex. 46 at 19; Ex. 47 at 15; Ex. 48 at 22.  While Skyline did not manufacture CDW, as set forth further below it is liable for claims arising out of deficiencies in that product.  Therefore, to the extent that CDW supplied by Skyline caused property damage at the Project, the policies provide products coverage for those damages.

Second, the policies cover "completed operations" claims.  *Id.* Broadly stated, these are claims arising out of an insured's completed "work".  Westchester has conceded that at least with respect to Skyline, the CDW claims at issue are completed operations claims.  SOF #24PEN. While "products" and "completed operations" claims are distinct, the American Home primary layer of coverage includes an aggregate limit for products and completed operations claims together.  Westchester Ex. 46 at 4; Ex. 47 at 41; Ex. 48 at 18.  An aggregate limit is the total amount that a carrier will pay for certain types of claims regardless of the total number of claims asserted or the total liability of the insureds.  American Home has agreed to pay that aggregate limit. SOF# 22PEN-23PEN.

11

Third, the policies include what is commonly known as "contractual indemnity coverage." In short, while there is an exclusion for liability assumed by contract (Exclusion b. in the American Home policy), the exceptions to that exclusion include liability that the insured would have in absence of the contract (*e.g.* for negligence), and liability assumed under an "insured contract". *See* Westchester Ex. 46 at 6; Ex. 47 at 4; Ex. 48 at 11. An "insured contract" includes that portion of any agreement under which an insured assumes the tort liability of another. *Id.* at 17; at 13-14; at 20-21. Most importantly, the definition of an "insured contract" includes indemnification agreements. *Id.* As is typical on most construction projects, Skyline agreed to indemnify Gryphon and Peninsula II for all claims and damages arising from or by reason of its work. SOF #4PEN. Skyline is thus liable under an "insured contract" for claims arising out of CDW at the project, including the tort liability of CDW manufacturers and suppliers. Importantly, the OCIP policies, including the Westchester policy which follows form to American Home on this point[3], expressly insure that liability. Nonetheless, Westchester simply ignores that liability in its moving papers. In sum, with respect to the property damage claims asserted by Peninsula II against Skyline, they are covered under the Westchester policy as a products claim, as a completed operations claim, and as a contractual indemnity claim. These coverages are addressed further below.

In this context, Westchester's assertion that Gryphon and Skyline have made no monetary claims against it is misleading. See SOF #3. While Peninsula II has and is incurring costs to resolve unit owners' claims and to remediate property damage at the Project, it seeks indemnification from Gryphon and Skyline. Thus, while Gryphon and Skyline are not currently seeking affirmative monetary recoveries from Westchester for damage payments they have made

---

[3]  See Westchester Ex. 49 at 21 ("Except as otherwise stated herein…this policy shall apply in like manner as [American Home].")

402974938

to date, they are seeking coverage for Peninsula II's claims.  Response to SOF #3. And, in this action, all three insureds are seeking to resolve issues regarding, among other things, the extent of insurance coverage available for Peninsula II's claims against Gryphon and Skyline.  In short, at issue is not only what coverage exists for unit owner and HOA claims against Peninsula II, but what coverage exists for Peninsula II's claims against Gryphon and Skyline.

### a.  The Westchester Policy covers Products Claims.

Again, under the American Home policy a products claim for purposes of the products-completed operations aggregate limit is defined as "'property damage' occurring away from premises you own or rent and arising out of 'your product'. . . ."  The Westchester Policy follows form in this respect.

Here, it is undisputed that Skyline installed a defective product - - CDW - - at the Condominium.  It is further undisputed that Skyline is liable for that product (including vicarious liability for the negligence of CDW manufacturers), and that this defective product caused significant damage to building components within the Condominium and loss of use of portions of that Condominium (property damage).  Skyline does not own or rent the property that has sustained damage.  As such, property damage arising from the defective CDW is covered as a products claim.

### b.  The Westchester Policy covers Completed Operations Claims.

The damages at issue here are further covered under the Westchester Policy as completed operations claims.  Under the American Home and Westchester policies, damages fall within the completed operations definition where they arise out of "your work" that has been completed.  As to Skyline, Westchester has stated that the property damages at issue arose out of Skyline's completed work.  SOF #24PEN. Indeed, Westchester has expressly argued that the claims fall within the completed operation period as against Skyline.  DE-146 at 10-11.   Specifically, in its

13

Motion to Dismiss, which is also pending before the Court, Westchester takes the position that "property damage taking place after each drywall completion but before overall building or unit completion would be a completed operation with respect to Skyline."   DE 146 at 10-11. Westchester confirms this position in its interrogatory response dated February 8, 2011.   See SOF #23. Accordingly, there can be no good faith dispute concerning the existence of completed operations claims covered by the Westchester Policy.

Furthermore, the claims of Peninsula II and Gryphon should also be treated as completed operations claims.   The only evidence in the record of physical damage to tangible property caused by CDW is damage to property discovered in early 2009 and subsequently, after all operations were completed on the Project.   SOF #11PEN-15PEN. Westchester's reliance on *Bayley Construction v. American Guarantee and Liability Ins. Co*, where, unlike here, it was undisputed that damage incepted before the policy period at issue, is misplaced.   *See* Westchester Ex. 59 at 3-4, 2010 WL 4272454 *2-3 (W.D. Wash. Oct. 15, 2010).

As to Peninsula II, Westchester attempts to challenge this completed operations position by speculating that property damage first commenced at some unknown time after Skyline installed the drywall but before all work was completed.   Opp. Mem. at 16-17. Westchester, however, offers no evidence - - and cannot offer any evidence - - to support its position.   Again, the only evidence in the record of property damage is property damage occurring in February 2009 and thereafter.   Westchester's speculation alone cannot defeat coverage.   Given the existence of a completed operations claim as to Skyline, and that the only credible evidence of when property damage occurred here was when it was first discovered in 2009, Peninsula II has clearly established that this CDW property damage claim falls within completed operations coverage, and Westchester's position must fail as a matter of law.

402974938

        **c.**       **The Westchester Policy provides Contractual Indemnity Coverage.**

The Westchester policy in following form to American Home on this point specifically provides contractual indemnity coverage for damages arising from the tort liability of another party that the insured has assumed in a contract.  Here, Skyline agreed under its subcontract with Gryphon to indemnify Gryphon and Peninsula II for its own negligence and that of its downstream suppliers and manufacturers from whom it obtained the defective drywall.  SOF # 4PEN.  Gryphon, in turn, agreed under the construction contract with Peninsula II to indemnify Peninsula II for its and Skyline's negligence, including the negligence of Skyline's downstream suppliers.  SOF #3PEN.  In light of the "insured contract" provisions, Westchester's policy provides coverage for damages arising from the liability of those downstream parties and suppliers.

        **2.**       **The number of occurrences is irrelevant because American Home is paying the Aggregate Products Completed Operations limit.**

Westchester argues that its policy is not triggered because this case involves multiple occurrences.  Specifically, Westchester argues that the damage to each affected unit in the building constitutes a separate occurrence, apparently in an effort to invoke multiple occurrences at the primary layer of OCIP coverage.  (Opp. Mem. Pp. 7-11).  The number of occurrences, however, is irrelevant because American Home paid a full aggregate products-completed operation limit.  As noted above, while each named insured is treated as separate and distinct for purpose of a coverage analysis, the limits of the OCIP policies apply jointly to all insureds.  Thus, once the aggregate limit of a primary or underlying layer of coverage is exhausted, it is exhausted as to all insureds.

Here, the American Home Policy provides limits of $2 million per occurrence and a $4 million products-completed operation aggregate.  In other words, while there is only $2 million

available under the American Home policy for any single occurrence, the aggregate amount is the most that American Home will pay in total for multiple occurrences or claims.  Thus, because American Home paid a full products-completed operations aggregate limit, there is no more products-completed operations coverage available under the Policy. As such, the Policy is exhausted and the Westchester policy is triggered.

Indeed, Westchester's lead underwriter confirmed this analysis: "If [American Home] paid $4 million for products/completed operations, their policy would be exhausted."  Response to SOF # 36.  He did not qualify the statement by conditioning it on the number of occurrences. It is a simple application of the excess policy language: When the aggregate limit of the primary policy is paid, the primary policy is exhausted.  American Home has agreed to pay that aggregate limit for products and completed operations coverage, so the primary layer is exhausted.  Thus, Whether there are two occurrences or 182 occurrences, the maximum amount of loss payable by American Home under the products completed operations aggregate is $4 million.  The Court should accordingly reject Westchester's argument that its policy is not triggered.

> **3.** **Westchester's prematurity arguments fail because the underlying insurance is exhausted and the insureds have incurred losses exceeding the amount of underlying insurance.**
>
> > **a.** **Westchester's argument that the claims at issue are premature ignores critical policy language and relies on caselaw that is inapplicable.**

First, as both parties addressed in detail in its response to Westchester's Motion to Dismiss, the Policy provision Westchester relies upon to support its prematurity argument is Condition C, which states in full:

> LIABILITY OF THE COMPANY WITH RESPECT TO ANY ONE OCCURRENCE SHALL NOT ATTACH UNLESS AND UNTIL THE INSURED, OR THE INSURED'S UNDERLYING INSURER, HAS PAID THE AMOUNT OF UNDERLYING INSURANCE STATED IN DECLARATIONS 5. IF THE COMPANY IS OBLIGATED TO INDEMNIFY THE INSURED, THE

> INSURED MUST MAKE A DEFINITE CLAIM FOR LOSS WITHIN TWELVE (12) MONTHS AFTER THE INSURED HAS PAID ANY AMOUNT OF EXCESS LOSS, AS STATED IN DECLARATION 6; OR AFTER THE INSURED'S LIABILITY SHALL HAVE BEEN MADE CERTAIN BY FINAL JUDGMENT OR BY WRITTEN AGREEMENT OF THE INSURED, THE CLAIMANT AND THE COMPANY.  ANY SUBSEQUENT PAYMENTS MADE BY THE INSURED ON ACCOUNT OF THE SAME OCCURRENCE SHALL BE PAYABLE BY THE COMPANY WITHIN THIRTY DAYS (30) DAYS AFTER ADDITIONAL CLAIM IS MADE BY THE INSURED, AND AFTER THE INSURED HAS SHOWN PROOF IN CONFORMITY WITH THIS POLICY.

Westchester Ex. 49 at 2.  *See* Opp. Mem. at 5 n.37.

Westchester ignores critical language in arguing that this language makes a final judgment or qualified settlement necessary preconditions to its liability.  The first sentence states that Westchester's liability attaches when the insured or the "underlying insurer[] has paid the amount of underlying insurance stated in Declarations 5."  That amount is $4 million, which American Home has agreed to pay in full.  Accordingly, the stated condition for attachment has been met.

The language Westchester relies on does not, as Westchester erroneously asserts, precondition coverage on the existence of either an underlying judgment or qualified settlement.  Westchester's argument is an attempt to rewrite Condition C of the "Pay on Behalf of Amendment" as follows:

> LIABILITY OF THE COMPANY WITH RESPECT TO ANY ONE OCCURRENCE SHALL NOT ATTACH ~~UNLESS AND~~ UNTIL THE ~~INSURED, OR THE INSURED'S UNDERLYING INSURER, HAS PAID THE AMOUNT OF UNDERLYING INSURANCE STATED IN DECLARATIONS 5. IF THE COMPANY IS OBLIGATED TO INDEMNIFY THE INSURED, THE INSURED MUST MAKE A DEFINITE CLAIM FOR LOSS WITHIN TWELVE (12) MONTHS AFTER THE INSURED HAS PAID ANY AMOUNT OF EXCESS LOSS, AS STATED IN DECLARATION 6; OR AFTER~~ THE INSURED'S LIABILITY SHALL HAVE BEEN MADE CERTAIN BY FINAL JUDGMENT OR BY WRITTEN AGREEMENT OF THE INSURED, THE CLAIMANT AND THE COMPANY.  ~~ANY SUBSEQUENT PAYMENTS MADE BY THE INSURED ON ACCOUNT OF THE SAME OCCURRENCE~~

17

~~SHALL BE PAYABLE BY THE COMPANY WITHIN THIRTY DAYS (30) DAYS AFTER ADDITIONAL CLAIM IS MADE BY THE INSURED, AND AFTER THE INSURED HAS SHOWN PROOF IN CONFORMITY WITH THIS POLICY.~~

*Id*. (emphasis added).  This revision, however, is not what the plain language provides.

The second sentence when read in full refers to the required timing of the notice of the claim submission, *i.e.*, if Westchester is obligated to indemnify, then Peninsula II must make a claim for loss within twelve months after 1) the insured has paid any amount of excess loss above the amount of underlying insurance, or, 2) the insured's liability is made certain by a) a final judgment, or b) written agreement of the insured, the claimant, and the company.  In no manner does this provision require that the insured's liability be determined by a final judgment or a qualified settlement before Westchester's obligations are triggered.  Indeed, in reading the provision as it was intended to be read there is only one precondition to the attachment of Westchester's obligations: the insured or the insured's underlying insurer has paid the amount of the underlying insurance.  Not only has American Home agreed to pay the underlying amount of insurance, but Peninsula II has already paid over $18 million of the expected $34 million in damages, well in excess of all underlying insurance.  Thus, the only pre-condition to attachment has been met.  The alternative trigger for timing of a notice of loss is therefore irrelevant.

Second, as Peninsula II made clear in its opposition to Westchester's Motion to Dismiss wherein it addressed this same point in detail, the California Supreme Court's 2001 decision in *Powerine I*[4] does not apply here.  See DE-156 at 12-13, incorporated herein by reference.  Westchester argues that under *Powerine I*, damages must arise from a court proceedings for coverage to attached.  There, however, the court addressed a CGL policy form where neither

---

[4]   *Certain Underwriters at Lloyds, London v. Superior Court (Powerine I)*, 24 Cal. 4th 945 (2001).

18

"suit" nor "damages" was defined and construed the terms narrowly.[5]   Accordingly, the holding

is expressly limited to that policy language, which is not present here.

Where, as here, suit is defined, the narrow definition of "damages" as construed in

*Powerine I* does not apply.  This was made clear in *Ameron Int'l Corp. v. Insurance Co. of State*

*of Pennsylvania*, 150 Cal. App. 4th 1050 (Cal. Ct. App. 2007).  There, the court addressed policy

language identical to that in the American Home policies and distinct from that in *Powerine I.*

Accordingly, in this different context, the court did not adopt the *Powerine I* construction of

"damages." *Id.* at 1061-62.  Rather, the court ruled that the "broad definition of "suit"...compels

an equally broad definition of "damages." *Id.* at 1075.   The court then adopted the definition of

"damages" set forth by the California Supreme Court in *AIU Ins. Co. v. Superior Court*, 51

Cal.3d 807, 799 P.2d 1253 (1990):  'compensation ["encompass[ing] any remunerative payment

made to an aggrieved party"] in 'money,' 'recovered' by a party for 'loss' or 'detriment' it has

suffered through the acts of another." *Id.*  Peninsula II's claims for the remediation and repair of

property damage at the Condominium fall squarely within this definition.  Damages are not

limited to "money ordered by a court."

In sum, Westchester's contention that California law requires there to be a court

judgment that awards damages high enough to reach its attachment point before it can have any

coverage obligation is wholly without merit.

Westchester further argues that the *Powerine I* court mandates that damages must arise

from a tort liability of the insured in order for coverage to attach.  Not only is this inaccurate, it

---

[5]  24 Cal. 4th 945 at 964.  *See also Ameron Int'l Corp.*, 242 P.3d 1020 at 1031 (J. Kennard concurring) (calling the *Foster-Gardner* decision on which *Powerine I* was based "far outside the mainstream of American insurance law" and remarking that the court's "implicit[] reject[ion in *Ameron* of ] *Foster-Gardner's* reasoning that "suit" [when undefined] unambiguously refers only to court proceedings" "at least a step in the right direction" in overruling *Foster-Gardner*.)

ignores the fact that the Westchester policy expressly provides coverage for an insured's contractual indemnity.

First, *Powerine I* does not hold that "damages" must arise from tort liability.   *See Powerine I* at 946 ("the duty to indemnify may embrace all money ordered by a court, including money ordered by a court under the law of torts, and in some cases, money ordered by a court under the law of contracts.")   Second, as discussed above, the Westchester Policy expressly provides contractual indemnity coverage for damages arising from the tort liability assumed by an insured pursuant to an indemnification provision.   That is precisely what Skyline did here.   By contract, Skyline agreed to indemnify Peninsula II and Gryphon for the tort liability of CDW suppliers and manufacturers including the damages arising from the manufacturers and suppliers of the defective drywall.   As such, the damages at issue do arise from tort liability which has been assumed by Skyline.

Furthermore, the American Home settlement payment of $4 million to Peninsula II is on behalf of Skyline for that liability.   SOF #22PEN.   Accordingly, Westchester's reliance on *Bennett v. Centerline Homes, Inc.*, a state trial court decision with no precedential value, is misplaced.   Westchester's argument based on the *Bennett* case also fails because Peninsula II asserts other claims against Skyline besides negligence.

> **b.      Repair costs accrue on a daily basis; the total costs are projected to a reasonable degree of certainty.**

Westchester contends that because Peninsula II has not remediated all of the units and thus does not have actual costs for each unit, there is no way for the Court to rule on Westchester's obligations to indemnify Peninsula II for those projected costs.   This is wrong. First, Peninsula II has already incurred losses of more than $18 million.

Unlike the cases Westchester relies on,[6] Peninsula II's claims are not based on some remote possibility that a future injury may happen at some point down the road.   Although Westchester may dispute the extent of damage in the building, Westchester cannot – and does not – deny that there is property damage.   At this point, the remediation efforts at the Condominium are approximately half-way complete, with costs accruing on a daily basis.   See Response to SOF # 25.   Peninsula II's expert damages report presents Peninsula II's total projected damages, including a reasonable estimate for the portion of the repair program that is still underway.   That estimate results in exhaustion of Westchester's excess layer, so Peninsula II only seeks the policy limit of $25 million from Westchester.   To the extent Westchester disputes the reasonableness of Peninsula II's repair methods, and/or any particular cost of repair, these disputed issues are issues for trial and not ones that can be decided on summary judgment.   *See Shageer*, 2010 U.S. Dist. LEXIS 126659.

4. **Westchester's Damage to Project Exclusion does not preclude coverage:   the damages at issue are covered as products claims, completed operations and under the policy provision for contractual indemnity coverage.**

Westchester next argues that the purpose of the Damage to Project Exclusion is so that its excess policy does not cover damage to the Project occurring during the course of construction that would otherwise be covered by a builders risk policy.   A builders risk policy typically covers

---

[6] See Westchester Memorandum 12 n. 74 citing *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985) ("mere possibility that [plaintiff juror criticized by judge after voting against death penalty] will once again be summoned, qualified, and selected to sit as a juror in a capital case before [defendant judge] and perhaps subjected to a reenactment of the scenario that occurred in this case is too remote to be labeled a controversy"); *S. Jackson & Sun, Inc. v. Coffee, Sugar & Cocoa Exch. Ins.*, 24 F.3d 427 (2d Cir. 1994) (no controversy between parties where warehouse owner sued coffee exchange for declaration that the exchange implemented its rules improperly in order to advance warehouse owner's position in a separate, unrelated proceeding).   The third case cited by Westchester, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), in which the Supreme Court reiterated general principles regarding declaratory judgment and reversed the lower courts' dismissal of a declaratory judgment action does not support dismissal here.   *Cf*, *GTE Directories Publ'g Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1569 (11th Cir. 1995) ("That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. Rather, "the practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists.") (citations omitted).

damages to a project while it is still under construction, and terminates as of the completion of construction.  General liability policies with completed operations tails are purchased, among other reasons, so that there is coverage for project participants of property damages claims arising after completion, like those here.

Westchester argues that the damages here occurred during construction and as such, the builders risk insurer must pay.  Westchester then suggests that Steadfast is Peninsula II's builders risk insurer and that Steadfast has paid Peninsula II's damages, citing Westchester Exs. 54-57. Steadfast is not the builders risk insurer.  Rather, Steadfast provided what is known as "Subguard" to Gryphon and Peninsula.  Subguard is not an insurance policy at all, but is the equivalent of a performance bond.  In short, while it effectively guaranties certain aspects of a subcontractor's performance, subguard does not protect to the subcontractor at all.  To the contrary, Steadfast retains the right to pursue claims against defaulted subcontractors, which claims are themselves potentially covered by the OCIP general liability policies.  Coverage is not lost under an insurance policy providing coverage for property damage because the insured is also bonded.  Indeed, on most major construction projects, the subcontractors, and often the general contractor are bonded.  As noted, bonds are not insurance; instead, they provided certain protections to the purchaser of the bond (*e.g.* a project owner) against defaults in performance by the bonded party.  They provide no coverage to bonded parties.  The fact that a project participant was bonded certainly does not mean that it loses insurance coverage.  Such a finding would essentially strip construction contractors of insurance, and effectively destroy the manner in which risk transfer and management is structured on most major construction projects.

Westchester then argues again that these damages are not covered under the products completed operations hazard because Peninsula II owns the property that has been damaged.  As

set forth above, not only does this argument ignore the fact that property damage has occurred in condominium units owned by third party homeowners, it ignores the plain language of the American Home Completed Operations Extension Endorsement, which provides that "Coverage provided under this extension applies to the owner of the project [Peninsula II] notwithstanding paragraph a. of the definition of the products-completed operations hazard." Westchester Ex. 46 at 48; Ex. 47 at 44, Ex. 48 at 51.  The Westchester policy follows American Home on this point. Westchester Ex. 49 at 17.  So, Westchester's arguments that Peninsula II's claims do not fit within that definition are misplaced.  (Opp. Mem. Pp. 15-18) .

Finally, as also set forth above, Westchester offers no credible evidence that any property damage occurred during construction.  To the contrary, Westchester has previously asserted that at least as to Skyline, damage occurred after its work was complete and therefore not during construction.  And with respect to Peninsula II and Gryphon, the only record evidence shows damage occurring in 2009, well after all construction was completed.

### 5. Other Exclusions relied upon by Westchester are equally unavailing and do not preclude coverage.

#### a. Exclusion j(1) does not apply to damage to third party owned units and does not apply to Gryphon and Skyline at all.

Westchester relies on Exclusion j(1), which excludes coverage for property damage to "property you own, rent, or occupy," in an effort to deduct from the damage calculation those costs incurred to repair inventory units still owned by Peninsula II because they contain CDW and have not yet been repaired.  Westchester concedes that the exclusion does not apply to the property damage in third party owned units.  Once again, Westchester ignore the fact that Gryphon and Skyline did not own, rent or occupy any of the property at issue, and therefore as to them as insureds, this exclusion clearly does not apply with respect to any of the damages at issue.  In short, Westchester covers Gryphon and Skyline's liability for damages to units still

owned by Peninsula II.  Furthermore, Peninsula II is entitled to coverage for its liability to all third party unit owners.  Westchester cannot meet its burden that j(1) unambiguously precludes coverage.

**b.      Exclusion j(6) expressly does not apply to completed operations claims and therefore does not apply here.**

Nor can Westchester meet its burden with respect to Exclusion j(6).  Exclusion j(6) expressly precludes coverage for property damage only to "that particular part" of property that must be repaired because "your work" was incorrectly performed on it.  It is well settled that the words "that particular part" refer only to that part of the work that is defective, not to damage resulting from the defective work.[7]   Here "that particular part" of the work which is defective is the CDW.  Peninsula II is not seeking coverage for the costs of replacement drywall.  Peninsula II is, however, seeking coverage for all property damage arising from that defective drywall.  Such costs are not subject the Exclusion j(6).

In addition, Exclusion j(6) does not apply to property damage to completed operations. Westchester Ex. 46 at 8-9, Ex. 47 at 6; Ex. 48 at 13.  As discussed above, the damage here falls within the completed operations hazard.  Therefore this Exclusion does not apply.

**c.      Exclusion j(6) does not bar Peninsula II's damages for carrying costs and lost profits.**

Westchester also relies on Exclusion j(6) in its attempt to bar Peninsula II's claim for coverage of certain costs incurred to carry and maintain units which could not be sold because of the existence of CDW, and its loss on the bulk sale of certain units which did not contain CDW, but were surrounded by units which did.  Exclusion j(6), however, has absolutely no application

---

[7]   See, *e.g.*, *Mid-Continent Cas. Co. v. JHP Dev. Inc.*, 557 F.3d 207, 215 (5th Cir. 2009) (holding that the phrase "that particular part" narrowed the reach of the exclusion to parts of the property that were themselves the defective work.); *Fortney & Weyngandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 311 (6th Cir. 2010) ("The opening words of the exclusion—namely, "[t]hat particular part"—are trebly restrictive, straining to the point of

to those damages.  As discussed above, Exclusion j(6) precludes coverage for the repair or replacement of "that particular part" of your work which is defective - - here the CDW.  It has no bearing on Peninsula II's claims for damage due to the "loss of use" of other property because of the existence of CDW.  Rather, Peninsula II's claim for and entitlement to these damages derives from the language of the basic insuring agreement.  Under that language, the insurers agree to pay "those sums that the insured becomes legally obligated to pay as damages *because of* "property damage" to which this insurance applies." Westchester Ex. 46 at 5; Ex. 47 at 3; Ex. 48 at 10 (emphasis added).  "Property damage" is defined to include loss of use of tangible property. An inability to sell the units is certainly a loss of use.

Moreover, the policy covers damages "because of" property damage.  The "common, popular and ordinary meaning" of "because of" is "as a consequence of" or "arising from." *See American Home Assur. Co. v. Libbey Owens Ford Co.*, 786 F.2d 22, 26-27 (1st Cir. 1986) (property damage is reasonably interpreted to mean all liability arising from such damage, including consequential damages.)    As one commentator has stated:

> Courts must initially determine whether consequential damages follow either a direct physical injury to tangible property or a loss of use of tangible property . . . If either of the two prongs of the "property damage" definition have been satisfied consequential damages may constitute property damage . . . [and] a loss arising from "property damage" is recoverable whether or not the loss is tangible.

Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Dispute,* § 7.03[b][2][D](9th ed. 1995).    Accord, *Policy Holder's Guide to Insurance Coverage* § 7.01[D][3]:

> [I]t is incorrect to begin the coverage analysis by focusing upon . . . the claimant's prayer for damages, and then to summarily conclude that the claims is one for "pure economic loss."  Pure economic loss is simply loss that results from neither bodily injury or property damage.  Therefore, only after first analyzing the claim

---

awkwardness to make clear that the exclusion applies only to building parts on which defective work was performed, and not to the building generally.")

for consistency with the property damage definition can the claim be labeled as one for either "property damage" or "pure economic loss."

California courts follow these principles.  *See, e.g.*, *Hendrickson v. Zurich AM. Ins. Co.*, 85 Cal. Rptr. 2d 622, 626-27 (Cal. Ct. App. 1999) ("the alleged loss of profits or diminution in property value are not solely economic losses, but constituted "damages *because of* property damage.") (emphasis added); *Geddes & Smith, Inc. v. Saint Paul Mercury Indem. Co.*, 63 Cal. 2d 602 (1965) (awarding damages for overhead expenses, including additional payment to employees such as supervisors, secretaries, and administrators as well as repairmen, and expenses incurred in order to placate those threatening legal action, as such expenses were incurred *because of* property damage); *see also Ticor Title Insur. Co., v. Employers Insur. Of Wausau*, 40 Cal. App. 4th 1699, 1706 (1995) (explaining that if a primary injury is covered under a policy, the economic loss stemming from that injury is likewise covered; *e.g.*, if an injured pedestrian becomes permanently disabled from an accident, a CGL policy would cover economic loss in the nature of lost career earnings *because it results from* the bodily injury.) Westchester's reliance on authorities that involve either stand alone claims for defective work ("that particular part") or pure economic loss, are therefore distinguishable.  See Opp. Mem. At 21 n.106.

Peninsula II engaged contractors, engineers and consultants to design and execute the repairs and remediation of the property damage caused by CDW.  Costs for the repairs accrue on a daily basis, and include direct costs of repairs, such as costs to tear out and replace corroded metal fixtures and piping, and costs to tear out and replace non-defective building materials to access damaged property, including unit-specific finishes and improvements, and the costs of inspections, testing and other consulting fees.

In addition to multi-million dollar costs to repair and replace tangible property damaged by the CDW, the loss of use of Condominium units due to the existence of CDW also constitutes "property damage" and is covered by the policies.  For example, Peninsula II has been unable to sell inventory units that are affected by CDW.  This inability to sell inventory - - a loss of use of tangible property - - constitutes "property damage."   It also reflects damages "because of" property damage.  Likewise a homeowner's inability to stay in his unit during remediation has lost the use of his property.  This loss of use likewise constitutes property damage and is covered.

In short, while the carrying costs, relocation costs and other damages at issue reflect loss of use, standing alone, the basic insuring agreement more broadly covers damages "because of" property damage - - both physical injury as well as loss of use - - caused by CDW.  Specific categories of damages covered in this sense include the following:

- Costs to relocate unit owners as repairs are undertaken.  Specifically, rental costs for replacement housing, costs to move unit owners' possessions and furniture, and costs to store unit owners possessions and furniture while their units are repaired;
- Peninsula II's "carrying costs" for units that Peninsula II still owns and cannot be sold until repairs are completed.  These are costs being incurred by Peninsula II to maintain ownership of these units until they can be repaired and sold, including utilities, HOA fees, taxes and interest.  As soon as a unit is repaired and available for sale, Peninsula II's damages model stops accruing these costs.
- Additional Management costs incurred to manage the repair;
- Costs associated with the bulk sale of certain units at below market price in December 2009.[8]

The majority of Peninsula II's damages fall squarely under the definition of "property damage."

They involve physical injury to tangible property, including loss of use of that property or loss of

---

[8] The vast majority of the units at Peninsula contain CDW, but some did not.  To remain in business, with some cash flow, Peninsula II was required bulk sell many of the units without CDW, at prices far below market value because the surrounding units were impacted.  At best Westchester raises an issue of material fact whether this loss reflect "damages because of property damage."

402974938

use of tangible property that is not physically injured.  The remainder of Peninsula II's damages reflect covered damages "because of property damage."

In sum, the OCIP policies do not simply protect against liability for "property damage." They protect against all liability for damage "because of . . .  property damage" including consequential losses flowing from that property damage.  Exclusion j(6) is inapplicable and does not preclude coverage here.

### C.    Westchester is not entitled to summary judgment on any obligation for defense costs.

The plain language of Westchester's policy defeats its attempt to escape its obligation to pay defense costs or expenses once the underlying insurance is exhausted.  Specifically, The policy provides coverage for defense costs under Condition F which provides:

> F. Expenses.  Loss and legal expenses incurred by the insured with the consent to the company in the investigation or defense of claims, including court costs and interest, shall be borne by both the company and the insured in the proportion that each party's share of loss bears to the total amount of such loss.  Salaries and expenses of the insured's employees shall not be considered as part of the above expenses.

Westchester Ex. 49 at 26.  Indeed, Westchester's William Schmaltz agreed.  *See Schmaltz Depo* 54:5-10 ("If [American Home has] paid, I believe their duty to defend ends, and then at that point the insured needs to defend themselves, and we'll pay expenses or we will - - will work with them."); 61:5-7 ("we would be responsible for some percentage of the defense costs if our policy was responding to the loss, yes.")  As set forth above, American Home has agreed to pay defense costs incurred by Peninsula II, Gryphon and Skyline through June 2, 2011, when its limits were exhausted.  From that point forward, Westchester's obligation under the above referenced provision are triggered.

28

402974938

The Westchester policy also provides that Westchester agrees  to "pay on behalf of the insured for that amount of loss which exceeds the amount of loss payable by [American Home.]" Westchester Ex. 49 at 2.  Under the American Home policies, once American Home exhausts the underlying coverage it is no longer liable for defense costs.  Therefore, under the plain language of the Westchester policy, Westchester is liable to pay on Peninsula II's behalf all loss in excess of American Home's obligation, including defense costs.  Nothing in the Westchester policy excludes defense costs from the definition of "loss."  SOF #43.   Thus, defense costs also reflect "losses" that Westchester has an obligation to pay on behalf of Peninsula II once American Home's policy exhausts.

### a.   Defense costs paid by American Home are not subject to summary judgment.

American Home agreed to pay $1.6 million in defense costs to Peninsula II, so Peninsula II has withdrawn from its damages summary defense costs incurred through June 2, 2011, the date of the American Home settlement.  This amount includes certain costs incurred for ATC Associates, Inc, Applied Technical Services, Inc, Delta Consulting Group, Inc., Environ, Sage Ventures, Angelo & Banta, Carlton Fields, and Daniels Kashtan Downs.   Peninsula II is no longer seeking to recover in this action defense costs paid by American Home, and will reduce its total damages claim accordingly.

### b.   Matco, SDM, WJE consultants fees are not "defense costs"

Peninsula II is entitled, however,  to recover from Westchester amounts paid to Matco Services ("Matco"), SDM Engineers ("SDM"), and Wiss Janney Elstner ("WJE") because they are not defense costs.    SDM is solely engaged in work associated with repair of affected units.  Response to SOF #44.   As such, these costs are not properly categorized as defense or investigative.  The vast majority of the work that Matco and WJE performed, including nearly all of their work since August 2010, was for repair and remediation.  *Id*.  Peninsula II disputes that

services provided to assist in the repair of units are "defense" costs.  At a minimum, there is a dispute of fact about whether any of the Matco or WJE costs are investigative costs under *AeroJet*, which cannot be resolved on summary judgment.

> **c.**    **Repair costs are not defense costs.**

In its last gasp, Westchester tries to escape its obligations by contending that all repair costs constitute defense costs under the holding of the California appellate court decision, *Barratt American, Inc. v Transcontinental Ins. Co*.  (Opp. Mem. at 16, citing 102 Cal. App. 4th 848 (Cal. App. 4th Dist. 2002.)  Of course, Westchester and its affiliated entities would vigorously oppose - - indeed express outrage - - at this notion in cases where it provided the primary layer of coverage to an owner or builder.  If it were correct, a $50 million repair could be covered as "defense costs" payable on top of limits, under a $1 million policy.  While many contractors would welcome that finding, Westchester's argument fails.  First, *Barratt* is grounded in the *Foster-Gardner* decision, which for the reasons discussed above does not apply to the policies here.  Second, the *Barratt* court ruled that costs to repair a non-plaintiff's property, if found to be reasonable and necessary to defend an existing lawsuit, *could* be recoverable as defense costs.  The holding does not stand for the blanket proposition that all repair costs may equate to defense costs.  In any event, here, in contrast, Peninsula II has incurred costs to repair property damage to resolve its liability, which under the holding of *AeroJet General*, a case also relied up on by Westchester,[9] means these costs do not constitute defense costs.

> **V.**    **CONCLUSION**

For the foregoing reasons, Defendant/Third Party Plaintiff Peninsula II respectfully requests that Westchester's Motion for Summary Judgment be denied in its entirety.

402974938

Dated:  June 29, 2011                    Respectfully submitted,


                                         By:   /s/ Eric C. Edison

                                         JAMES W. CARPENTER, ESQ.
                                         Florida Bar No.: 654256
                                         ERIC C. EDISON, ESQ.
                                         Florida Bar No. 010379

                                         ANGELO & BANTA, PA.
                                         SunTrust Center, Suite 850
                                         515 East Las Olas Blvd.
                                         Fort Lauderdale, FL  33301
                                         Telephone:  954-766-9930
                                         Facsimile:  954-766-9937
                                         Email:  jwc@angelolaw.com
                                         Email:  ece@angelolaw.com

                                         and

                                         DAVID T. DEKKER, ESQ. (admitted *pro hac vice*)
                                         MELISSA C. LESMES (admitted *pro hac vice*)
                                         MICHAEL S. MCNAMARA (admitted *pro hac vice*)

                                         PILLSBURY WINTHROP SHAW PITTMAN LLP
                                         2300 N Street
                                         Washington, D.C. 20037
                                         Telephone:  202.663.8000
                                         Facsimile:  202.663.8007
                                         Email:  david.dekker@pillsburylaw.com
                                         Email:  melissa.lesmes@pillsburylaw.com
                                         Email:  michael.mcnamara@pillsburylaw.com

                                         *Attorneys for Peninsula II Developers, Inc.*

---

[9]  See Opp. Mem. at 24 n.116, 26.

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2011, I electronically filed the foregoing document with

the Clerk of Court by using the CM/ECF system.

By: /s Eric C. Edison_____
    JAMES W. CARPENTER, ESQ.
    Florida Bar No.: 654256
    ERIC C. EDISON, ESQ.
    Florida Bar No. 010379

32

402974938