**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-CV-23691-SEITZ-SIMONTON**

PENINSULA II DEVELOPERS, INC., a Florida
corporation; GRYPHON CONSTRUCTION
COMPANY, a Florida limited liability company;
and SKYLINE SYSTEMS, INC., a Florida corporation,

                 Plaintiffs,

    v.

WESTCHESTER FIRE INSURANCE COMPANY, a
New York corporation, and LANDMARK AMERICAN
INSURANCE COMPANY, an Oklahoma corporation,

                 Defendants.

_____/

**PENINSULA II DEVELOPER INC.'S OPPOSITION TO WESTCHESTER FIRE
INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AGAINST ALL
PLAINTIFFS ON CERTAIN CATEGORIES OF ALLEGED PROPERTY DAMAGE**

       Peninsula II Developers, Inc. ("Peninsula II"), submits this memorandum of law in opposition to *Defendant Westchester Fire Insurance Company's ("Westchester") Motion for Summary Judgment Against All Plaintiffs on Certain Categories of Alleged Property Damage.*

**I.      INTRODUCTION**

       The plain language of the Westchester policy requires Westchester to indemnify each insured for its legal obligation "to pay damages because of . . . 'property damage'" caused by a covered occurrence. "Property damage" is defined as physical injury to tangible property or loss of use of tangible property. It is undisputed that Chinese drywall ("CDW") installed at the Project caused both physical injury to and loss of use of portions of the Condominium. Peninsula II, Gryphon and Skyline incurred legal liability to third party unit owners and the Condominium Association for damages because of that physical injury and loss of use. In

addition, Gryphon and Skyline are liable to Peninsula II for damage because of the physical injury to and loss of use of property it owned.  As such, Westchester is obligated to pay -- and the insureds meet their burden of proof when they establish -- damages that measure or are "because of" physical injury to, or loss of use of, the Condominium by reason of CDW.

Peninsula II has now incurred over $25 million in damages as a result of "property damage" caused by CDW installed by Skyline.  Peninsula II expects that when all the remedial work has been completed, that number will be close to $34 million.  These damages, analyzed by Peninsula II's damages expert in a February 25, 2011 report and addressed in detail in Peninsula II's *Motion for Summary Judgment on its Entitlement to Damages and Incorporated Memorandum of Law* ("Peninsula II's Damages Motion"), include costs which reflect physical injury to tangible property, including costs incurred to repair the damaged work, costs incurred to remove and replace undamaged work that is necessary to effectuate the repair of damaged and defective work, as well as the attendant costs of that repair (*e.g.* labor costs, consultants costs, material, overhead, and fees).  The damages also include costs which reflect the loss of use of property caused by CDW, such as costs to relocate homeowners into temporary housing while their homes are being repaired, and costs incurred by Peninsula II to maintain units which could not be sold due to the presence of CDW.  In addition, these damages include costs that are causally related to or otherwise "because of" the "property damage", including losses sustained by Peninsula II in a below market bulk sale of certain units that Peninsula II was forced to incur as a result of the CDW, as well as costs incurred to mitigate further covered losses.  All of these categories of damage are covered by the Westchester policy as damages because of physical injury to or loss of use of tangible property.

In the Factual Background section of its motion, Westchester enumerates ten "cost categories" from a spreadsheet Peninsula II prepared to identify costs incurred through July 2011 on a unit-by-unit basis. Without referring to a particular category, Westchester argues generally that none of the insureds are entitled to the damages sought because economic losses resulting from inferior materials or workmanship that do not damage other property are not covered under the OCIP policies. The damages at issue, however, are not pure economic losses. To the contrary, the damage categories at issue reflect physical injury to tangible property as a result of the CDW and are a proper measure of damage "because of" the "property damage" caused by CDW.

Although there are numerous categories of damage for which the insureds seek coverage, the only specific categories Westchester addresses in its motion are Peninsula II's claim for the costs it incurred to carry the damaged inventory units while they were being repaired and the losses it sustained as a result of a below market sale of 12 unaffected units. Westchester argues that both categories result from defective material that does not damage other property. First, the damage associated with Peninsula II's loss on the bulk sale and Peninsula II's carrying costs are two distinct categories of damage and must be analyzed separately. Secondly, for the reasons stated below, both categories reflect an appropriate measure of damage to property by reason of the CDW and/or flowing from that covered property damage.

On January 13, 2012, Peninsula II filed its Damages Motion (DE 296). That motion addresses many of the issues relevant to Westchester's motion here and the arguments raised herein. That motion is incorporated herein by reference. For the reasons stated below and the reasons addressed in more detail in Peninsula II's own motion on its entitlement to damages, Westchester's motion should be denied.

## II.    MATERIAL FACTS

The facts material to this motion are stated in the accompanying *Peninsula II's Response to Defendant Westchester Fire Insurance Company's Statement of Material Facts* ("RWSOF") and *Peninsula II's Statements of Material Facts in Support of its Motion for Summary Judgment on its Entitlement to Damages* ("PD SOF"), which is incorporated herein by reference.  The essential facts are as follows:

The Peninsula II Condominium Project was insured by an OCIP.  Peninsula II, the developer, Gryphon, the general contractor, and Skyline, the drywall subcontractor, are all insureds under the OCIP.  American Home provided the primary layer of coverage and Westchester provided the first layer of umbrella coverage.  Westchester's policy, with some significant exceptions not relevant here, follows the language of the American Home policy. (RWSOF #5,53; PD SOF #1-4).

Construction of the Condominium began in 2005 and Peninsula II began closing units in August 2007.  (RWSOF #8-10; PD SOF #5-7).  By January 16, 2009, Peninsula II had sold 92 of the 223 units.  (PD SOF #28).  In February 2009, unit owners at the Project began complaining of property damage arising out of CDW.  Specifically, unit owners and shortly thereafter the Condominium Association, served Section 558 claims complaining of odors and corrosion on HVAC coils, appliances and other metal materials, as well as other damages.  (RWSOF #30; PD SOF #8).  Peninsula II investigated the claims and ultimately determined that 181 of the 223 units, both inventory and third party owned, and certain common areas of the Condominium, had sustained property damage as a result of CDW.  (PD SOF #10).

In consultation with various experts, and following Judge Fallon's rulings out of CDW multi-district litigation in the Eastern District of Louisiana, Peninsula II developed a

comprehensive CDW remediation protocol, which included removing and replacing all of the defective drywall and damaged property, as well as any material necessary to gain access to damaged or defective work, and then re-building the units back to their pre-damaged condition. (PD SOF #11).  Specifically, all of the drywall in each of the 181 affected units and the elevator lobby areas has to be removed and replaced.  (PD SOF #15).  All of the building components and improvements installed in front or on top of the defective drywall, must also be removed in order to access corroded metals and wiring and to remove the defective drywall.  Insulation and carpeting must also be removed and replaced as that material is damaged by the drywall dust during removal.  And, because some porous building components, *e.g.* concrete behind the walls, showed signs of taking in the off-gases which could potentially be released back into the units, each affected unit is also sprayed with a neutralizing agent after the CDW is removed.  (RWSOF #27; PD SOF #15-16).  Once the spraying occurs and metal wiring and other components are tested to ensure that they have not been compromised by the off-gassing or repair effort, the "put back" takes place in which all of the units finishes are restored to their original condition. (RWSOF #13; PD SOF #19).

For occupied units, this process means that homeowners must be relocated while the repair is performed.  For inventory units, this means that Peninsula II is forced to incur additional and unanticipated costs, such as HOA and COA fees, real estate taxes, insurance premiums and the like, to carry these units while they are being repaired and cannot be sold.  (RWSOF #1,13; PD SOF #27).

The damages incurred as a result of the property damage sustained at the Condominium include repair costs, including but not limited to costs to remove and replace not only metal components corroded by the off gassing, but property damaged as a result of the repair of those

corroded materials and by the removal and replacement of the drywall itself.  The damages also include management time, consultant costs, and overhead; resident relocation costs; carrying costs; and losses as a result of a bulk sale of unaffected units below market price effectuated to keep Peninsula II afloat during repairs in the building.  (RWSOF #1; PD SOF #11,26-30).  Specifically, as to this last category, because the OCIP carriers had denied coverage and were not paying for the repair process, Peninsula II's resources were drained and it found itself without resources needed to undertake repairs.  Unable to market its units at full value due to the presence of CDW in the building, Peninsula II was forced to sell 12 unaffected units for below market value.  The loss sustained on this bulk sale was directly attributable to the OCIP carriers' denial of coverage and the CDW damage.  (RWSOF #1; PD SOF #30).

Simply put, this is not a situation where Westchester can tally the corroded sprinkler heads or HVAC air handling units and declare that is the only property damage from CDW, and therefore the only costs that are covered.  Such an approach ignores the scope of coverage afforded under the OCIP policies, which under well settled law includes coverage not just for the repair of corroded materials, but also for the repair of those materials that are damaged by the remediation process, the loss of use of units, and all damages that constitute "damages *because of* property damage."  (RWSOF #3; PD SOF #33).  As such, Westchester's motion fails as a matter of law.

## III.    ARGUMENT

Westchester's motion suggests that its policy covers <u>only</u> the cost to repair property that was corroded by the CDW, and that the remainder of Peninsula II's damages constitute uncovered "economic losses."  Specifically, rather than addressing the individual damage categories claimed by Peninsula II, Westchester challenges the insureds' entitlement to coverage

for these damages by arguing generally that "where the insured's defective work or products causes financial losses to the claimant, but the defective work does not result in any actual physical injury to tangible property or loss of use of tangible property that has not been physically injured, there is no property damage."  (DE 285 at 7).  Westchester's argument ignores both the undisputed fact that each affected unit and common area sustained property damage as a result of the CDW and the plain language of its policy and well-established law.

Under the Westchester insuring agreement, Westchester agrees:

> To pay on behalf of the "Insured" for that amount of loss which exceeds the amount of loss payable by "Underlying Insurance" described in the Declarations [that is, the American Home policy] . . .

(RWSOF #3; PD SOF # 32).  The American Home primary policy provides that:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.

(RWSOF #3; PD SOF #33).  "This insurance applies" to "property damage" that is caused by an "occurrence".  An "occurrence" is defined as an accident or continuous exposure to substantially the same general harmful conditions.  (PD SOF #34).  "Property damage" is defined as:

> a. Physical injury to tangible property, including all resulting loss of use of that property … [or]
> b. Loss of use of tangible property that is not physically injured . . .

(PD SOF #35).  As addressed in detail in Peninsula II's Damages Motion, the damages Peninsula II seeks are all damages because of physical injury to or loss of use of tangible property, and, as such, as a matter of law, are covered under the plain language of the policies.

A.      **Costs reflecting damages because of physical injury to and loss of use of tangible property are covered.**

Importantly, costs that reflect the measure of damages because of physical injury to or loss of use of tangible property are covered. *Geddes & Smith v. St. Paul Mercury Indem. Co.*, 63 Cal. 2d 602 (1965) ("*Geddes II*").  As the California Supreme Court explained in *Geddes II*, where defective doors caused property damage and had to be replaced, the appropriate measure of damage to tangible property includes all of the attendant costs of the repair process.  And so, in *Gedde*s, while the costs of the defective doors themselves were excluded under the policy, the costs of removing the old items and installing the new were not.  *Id.* at 607.  In rejecting the insurers' position that an attendant cost – overhead – was an uncovered economic loss, the court explained:

> [D]efendant asserts that this overhead represents an injury to plaintiff's business, and that no part of it is recoverable under our previous decision because it does not constitute damage to physical or tangible property. This contention confuses two issues which should be carefully distinguished: the first concerns the type of injury covered by the policy, and it was in the context of this question that we stated that only damage to physical or tangible property was recoverable; the second is the method by which the damage to the physical property is to be measured in monetary terms.
>
> One of the alternative measures of damage approved in our earlier opinion was the cost of removing the doors and restoring the houses, plus the loss of use thereof.  A major element of the repair costs consisted of the wages of the carpenters and other men who actually worked on the [project], . . . The employment of supervisors, secretaries, and administrators was also required to carry out the repairs.  And in order that the work proceed, additional expenses were incurred in placating the homeowners who were threatening immediate legal action.  These overhead expenses would seem to be as integral a part of the cost of restoring the houses as were the wages of the carpenters.  Neither the salaries of the workmen nor the expenses of overhead are themselves physical property; they are recoverable because they provide a measure of the dollar amount of the injury to the houses.

*Id.* at 609.  *See also*, *Stearman v. Centex*, 78 Cal App. 4th 611 (Cal. Ct. App. 2000) (the "cost of repair is the proper measure of damages in a construction defect case," and affirming award of

the costs for experts "who investigated the problems in order to formulate an appropriate repair plan" as part of the cost of repair).

It is well settled that the cost of repair – that is, the cost to remedy physical injury to tangible property – includes not only the costs incurred to repair component parts that were damaged as a result of the CDW, but also includes the cost to remove and replace otherwise undamaged work in order to remove the damaged or defective work.  Under California law, where a contractor's work, which subsequently proves to be defective, is installed within a larger structure or entity such that it cannot be removed or replaced without causing damage to surrounding components, the damage incurred to the surrounding non-defective work in order to get to the defective work is covered.  *Eichler Homes, Inc. v. Underwriters at Lloyd's, London*, 238 Cal. App. 2d 532 (Cal. App. 1965).

*Burke Concrete Accessories, Inc. v. Tolson*, 27 Cal. App. 3d 237 (Cal. App. 1972), is illustrative.  There, the insured provided defective "snap plugs" for use in filling holes left in poured concrete walls after removal of the forms.  The plugs deteriorated causing damage to the structures in which they were used, making it necessary that the plugs be removed.  The plugs were removed by drilling and hammering them out of the concrete walls and refilling the resulting holes with a cement mixture.  The insurer refused to pay for the cost of removal, arguing that there could be no coverage for replacing defective work.  *Id*. at 241.  The court disagreed, holding that the cost to rip through otherwise non-defective concrete to remove the defective plugs was covered.  The court explained that "repairing the damaged walls . . . was the very sort of risk for which the policy was written and its premium was paid."  *Id*. at 242.

Similarly, in *Eichler Homes, Inc.*, 238 Cal. App. 2d 532, the court found a duty to defend where damages were incurred to non-defective parts (concrete floors of homes) in order to repair

defective parts (radiant heating systems).  There, the insured homebuilder was sued by a number of homeowners for damages resulting from the rupture and leakage of radiant heating systems installed in the homes' concrete floors.  In finding that the insurer had a duty to defend the insured homebuilder against each action, the court explained that each of the complaints contained some allegation of damages beyond the defective heating system itself, including damages to large portions of the concrete floor that had to be "torn up" to repair the heating system.  *See also Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 93 Cal.Rptr.2d 364 (Cal. App. 2000) (incorporation of the wood splinters into a nut cluster cereal constituted property damage in that the only way to remedy the damage was to injure the remaining parts).

The Ninth Circuit has likewise made this position clear in *Dewitt Construction, Inc. v. Charter Oak Fire Insurance Co.*, 307 F.3d 1127 (9th Cir. 2002).  There an insured subcontractor had to replace negligently installed cement piles, and during that repair process the work of other subcontractors was damaged.  *See id*. at 1132. The 9th Circuit held that damage to the work of other subcontractors qualified as property damage -- physical injury to tangible property -- under the policies and, as such, was covered under a standard CGL policy.  *Id*. at 1133-1136.

Finally, the insuring language of the Westchester Policy unequivocally provides coverage for "damages" <u>because</u> <u>of</u>….'property damage'."  The California Supreme Court gives a broad construction of the phrase "because of property damage."  *Watts Industries, Inc. v. Zurich Am. Ins. Co.*, 121 Cal. App. 4th 1029, 1041 (Cal. App. 2004).  Indeed, the "common, popular and ordinary meaning" of "because of" is "as a consequence of" or "arising from." *See e.g. American Home Assur. Co. v. Libbey Owens Ford Co.*, 786 F.2d 22, 26-27 (1st Cir. 1986), *Cf. Continental Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir. 1985) ("arising from" is

understood to mean 'originating from' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to, or having connection with'").  Thus, all damages arising from or as a consequence of physical injury to or loss of use of tangible property, are covered.

> As one commentator has stated:
>
> Courts must initially determine whether consequential damages follow either a direct physical injury to tangible property or a loss of use of tangible property . . . If either of the two prongs of the "property damage" definition have been satisfied consequential damages may constitute property damage . . . [and] a loss arising from "property damage" is recoverable whether or not the loss is tangible.
>
> Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Dispute,* § 7.03[b][2][D](9th ed. 1995).

Therefore, if "property damage" exists, then all losses flowing from or as a consequence of that property damage are recoverable.  *Id.;* S*ee also Ticor Title Insur. Co., v. Employers Insur. Of Wausau*, 40 Cal. App. 4th 1699, 1706 (1995) (if a primary injury is covered under a policy, the economic loss stemming from that injury is likewise covered).

Here the CDW damaged property other than itself in connection with every affected unit and elevator lobby, and caused loss of use of individual units and other property throughout the Condominium.  In addition to repair costs, including but not limited to incorporation or rip and tear damages, damages were incurred because of that physical injury and loss of use.  These damages include, but are not limited to, management time, consultant costs and overhead; relocation costs; carry costs; and losses as a result of the bulk sale.  (RWSOF #1; PD SOF #11, 26-30). In short, the Westchester policy covers all damages that flow from the physical injury to and loss of use of any portion of the Condominium.  Simply calling these damages "economic losses" does not change this result.  As one commentator explains:

> [I]t is incorrect to begin the coverage analysis by focusing upon . . . the claimant's prayer for damages, and then to summarily conclude that the claim is one for "pure economic loss."  Pure economic loss is simply loss that results from neither bodily injury or property damage.  Therefore,

> only after first analyzing the claim for consistency with the property
> damage definition can the claim be labeled as one for either "property
> damage" or "pure economic loss."

*Policy Holder's Guide to Insurance Coverage* § 7.01[D][3].

Westchester's reliance on *Giddings v. Industrial Indemnity Co.*, 112 Cal. App. 3d 213 (Cal. Ct. App. 1980), *Stein Brief-Group, inc v. Home Indemnity Co.*, 65 Cal. App. 4th 364 (Cal. Ct. App. 1998), *Kazi v. State Farm Fire & Cas. Co.*, 15 P.3d 223 (Cal. 2001), *Gulf Ins. Co. v. L.A. Effects Group, Inc.*, 827 F.2d 574 (9th Cir. 1987), *F&H Construction v. ITT Hartford Ins. Co. of the Midwest,* 118 Cal. App. 4th 364 (Cal. Ct. App. 2004), as authority that pure economic loss is not covered, is misplaced.  In each of those cases there was no property damage.

In *Giddings*, for example, the insureds sought coverage for liability from shareholder actions brought, *inter alia*, for violations of federal banking and securities laws.  112 Cal. App. 3d at 215.  The damages alleged included money lost on worthless capital notes and the loss of shareholder investments.  As the *Giddings* court explained, because there was no claimed injury to tangible property, the damages at issue reflected strictly economic losses that were not covered:  "By no stretch of the imagination can the allegations of waste and misappropriation of corporate assets be transformed into allegations of physical damage to tangible property."  *Id*. at 220.  As such, this case is not instructive.

Nor is *Stein-Brief*, *Inc*., 65 Cal. App. 4th 364.  There, a developer insured sought defense for two actions, one involving the loss of use of an easement, the other seeking damages for delays and increased costs of home construction due to the loss of use of the easement.  The court found that an easement is not "tangible property," and thus the loss of use of an easement is not "property damage" as defined by the policy.  Absent any physical injury or loss of use of

12

"tangible" property, the claims were for purely economic damages for which there was no coverage. *Id*. at 373. Here, by contrast there has been widespread "property damage."[1]

*Gulf Insurance Co. v. The LA Effects Group, Inc*., 827 F.2d 574, is equally unpersuasive. There, a movie company sought recovery of the money it had advanced to a special effects company for work on the film *Aliens*. There were no allegations that the film itself was damaged, but rather that the special effects sequences were inexpertly produced and thus had to be omitted from the film. As the court explained, the "artistic value of the film" does not constitute a form of tangible property covered under the CGL policy. Further, there was "no objective means available to quantify in substantive economic terms any diminution in the artistic value of Aliens." *Id*. at 579. Here, by contrast, there is not only significant and undisputed physical damage throughout the building, there are objective means, such as repair costs, historical market data, and financing costs, which accurately quantify that property damage. On these bases, the decision is completely inapposite.[2] *See also F&H Construction v. ITT Hartford Insurance Company*, 118 Cal. App. 4th 364 (the court found that there was no property damage and no other property had to be removed, destroyed, or repaired in the process); *St. Paul Fire & Marine Ins. Co. v. Coss*, 80 Cal. App. 3d 888 (Cal. Ct. App. 1978), (the court found that poor workmanship itself was not property damage within the terms of the policy);

---

[1] *Kazi v. State Farm Fire & Casualty Co.*, 15 P.3d 223, is similarly unavailing. There a land owner, Kazi, graded an access road on his property. The adjacent neighbors sued complaining that the road interfered with their implied easement over Kazi's land. Kazi tendered the suit to its liability carrier which denied coverage. The California Supreme Court focused on the term "tangible property" in the definition of "property damage" and determined that because "damage did not flow from any injury to the land but from the alleged injury to a right to an easement, which is intangible" there was no coverage. *Id*. at 231.

[2] Another distinguishing feature of *Gulf Insurance* is that because it was clear that there was no physical injury to tangible property, the court did not need to determine whether there was an "accident" within the meaning of "occurrence." *Id*. at 577. It is well settled under California law (and, for that matter, Florida law) that faulty workmanship or defective construction which causes injury to other building components constitutes an "occurrence" as defined by the policies. *See Anthem Elec. Inc. v. Pac. Employers Ins. Co.*, 302 F. 3d 1049 (9th Cir. 2002); *see also*, *Auto-Owners Insurance v. Pozzi Window Co.*, 984 So. 2d 1241 (Fla. 2008); *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 874 (Fla. 2007).

*Golden Eagle Ins. Co. v. Travelers Cos.*, 103 F.3d 750 (9th Cir. 1996) (the court found under a different policy form[3] than the one at issue here, that defective concrete flooring work itself was not property damage and without addressing the incorporation argument or caselaw, the court also held that the suggestion that floor coverings might have to be removed in order to repair the concrete floors was not enough).

Nor is *New Hampshire v. Viera*, 930 F.2d 696 (9th Cir. 1991), particularly instructive as Westchester contends.  There, the contractor failed to nail the drywall properly to interior walls and failed to install drywall in attics in order to prevent fire from spreading.  To remedy the defective and incomplete work, the owner elected to add a heat detection and monitoring system and to install additional drywall in the attics. For the latter, holes had to be cut into the roofs.  There was no allegation that the drywall damaged other property in the first instance, only that the costs sought were for the monitoring system and for the installation of the attic drywall.  Notably, the *Vieira* court distinguished between removing and adding material to find property damage:

> Vieira bases his argument on *St. Paul Fire & Marine Ins. Co. v. Sears, Roebuck & Co.*, 603 F.2d 780 (9th Cir. 1979), which held that if repair to the insured's product results in damage to another part of the building, that damage is covered.  Vieira argues that under this reasoning, the damage caused by cutting holes in the roofs is property damage covered under the policy.  *St. Paul* is factually distinguishable because the repairs in that case required *removing* the defective material.  In the present case, repairing the defective installation required *adding* drywall, not removing it.  The California Supreme Court acknowledged this distinction in *Geddes*, declining to follow *Volf v. Ocean Accident & Guar. Corp.*, 50 Cal.2d 373, 325 P.2d 987 (1958), and adopting the rule of *Hauenstein*, on the ground

---

[3]   In 1986 standard form CGL policies were revised to include "Broad Form Property Damage" coverage. Among other things, this included coverage for damage to the insured's "work" where the damaged work or the work out of which the damage arises was performed by a subcontractor. *See, e.g., J.S.U.B., Inc.*, 979 So. 2d 871, 891 (the "post-1986 standard form commercial general liability policy with products completed-operations hazard coverage, issued to a general contractor, provides coverage for a claim made against the contractor for damage to the completed project caused by a subcontractor's defective work.") The policy in *Golden Eagle* incepted in 1985 and, unlike the OCIP policies here, does not include this coverage.

> that in *Hauenstein* removal of a defective product was required, and in
> *Volf* no removal was necessary.  *Geddes*, 51 Cal.2d at 565, 334 P.2d 881.

*Id.* at 701. Here, as in *Geddes*, and unlike in *Vieira*, defective drywall , and other components of

the Condominium damaged by the CDW, must be removed from every affected unit and elevator

lobby and, as such, the damage caused by that removal is plainly covered property damage.

      Furthermore, to the extent *Vieira* held that diminution of value was not a measure of

property damage it is because the *Vieira* Court found that there was no property damage.  Where

there is property damage, as there is here, California courts continue to recognize diminution in

value as a proper measure of  damage.  *See Pruyn v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500,

510 (Cal. App. 2d Dist. 1995) ("In the liability policy context, diminution in market value is

accepted as a proper method of measurement of any property damages which may have been

sustained.") citing *Geddes I*, 51 Cal. 2d at 565; *Eichler Homes Inc. v. Underwriters at Lloyds,

London*, 238 Cal. App. 2d 532, 538 (Cal. Ct. App. 1965).  *See also*, *Shade Foods, Inc. v.

Innovative Products Sales & Marketing, Inc.*, 78 Cal. App. 4th 847, 865 (Cal. App. 1st Dist.

2000) (distinguishing cases such as *Golden Eagle*, *Vieira*, and *Coss* where diminution in the

value of a product by reason of a defective part or faulty workmanship was held not to constitute

property damage from cases when a defective part causes injury to other property, as in *Geddes*).

      Here, Peninsula II does not seek the cost of defective construction standing alone nor

does it seek purely economic loss resulting from inferior materials that did not physically

damage or cause the loss of use of any other property.  The inferior materials – in this case, the

CDW – caused widespread physical damage to and loss of use of other property.  As such, the

authority relied upon by Westchester is inapposite.

**B.     Carry Costs And Loss on Bulk Sale Are Covered.**

The only categories of damage that Westchester addresses specifically in its motion are 1). the costs Peninsula II incurred to maintain or "carry" inventory units during the repair process, and 2). the loss Peninsula II sustained as a result of it having to bulk sell 12 units at below market value in order to avoid bankruptcy due to the CDW at the Condominium.

With respect to the carry costs, these are clearly damages "because of" physical injury to and loss of use of tangible property, which are covered under the policy.  It is undisputed that Peninsula II lost the use of 89 of its inventory units as a result of the property damage caused by CDW.  Peninsula II was forced to take those units off the market in April 2009, and could not put them back on the market until the individual repairs were completed.  (PD SOF #28).  During the time it was unable to sell these units, Peninsula II not only incurred the actual costs of repairing them, but the additional financing costs associated with having to maintain the units during the repair.  Specifically, Peninsula II was forced to pay Homeowners Association and Condominium Association fees, additional costs to extend its insurance coverage on the property, monthly utility costs, loan interest and real estate taxes, all of which would have been born by a purchaser had Peninsula II not been forced to take this damaged inventory off the market as a result of the CDW.  (PD SOF #29).  These damages reflect "loss of use of tangible property," as well as damages "because of" physical injury to the affected units.

Moreover, because they provide a measure of the loss of use of tangible property, under California law, this category of economic damages is covered.  *See Geddes,* 63 Cal. 2d 602 (1965).  When economic losses are a measure of the physical injury to the tangible property, including loss of use, those losses fall within the scope of coverage.  *Id.*; *Hendrickson v. Zurich*, 85 Cal. Rptr. 2d 622, 626-27 (Cal. Ct. App. 1999) ("the alleged loss of profits or diminution in property value are not solely economic losses, but damages *because of* property damage, and

therefore constituted alternative measures of any property damage allegedly sustained"); *Centillium v. Atl. Mut. Ins. Co*., 528 F. Supp. 2d 940, 946 (N.D. Cal. 2007).  Again, Peninsula II is not asking the Court to rule whether Peninsula II has proven these damages, only that if it does, those damages are covered.

With respect to the loss on the bulk sale, these damages flow from the physical injury to and loss of use of the Condominium and, as such, are damages "because of 'property damage.'" Due to the existence of CDW in the building, Peninsula II was able to sell only 3 units between April and December 2009.  (PD SOF #30).  Most prospective purchasers are not interested in buying unaffected units in a building where most of the units and elevator lobbies have suffered physical injury, and where there is a distinctive sulfur odor.  The sale of units was expected to provide a major source of cash flow to Peninsula II, which was now also being drained by repair costs.  Indeed, American Home, which had reimbursed Peninsula II for some costs, had by that time stopped paying, and then filed suit.  In an effort to generate some cash flow, Peninsula II was forced to bulk sell 12 units for well below historical prices and market value.  Had the building not contained CDW, Peninsula II would have been able to sell units for $271.70 a square foot.  Instead, Peninsula II was forced to sell the units for $200.12 a square foot, a significant loss resulting from the presence of CDW and the resulting property damage.  (PD SOF #30).  Peninsula II does not ask the Court to rule on the validity of the underlying claim, only that if these elements are established, the coverage exists.  In short, if Peninsula II can prove that it suffered this loss because of physical injury to and loss of use of substantial portions of the Condominium, then, but only then, the damages are covered.

Westchester contends that any proven impact on the value of these units by reason of physical damage to and loss of use of most of the building due to the presence of Chinese

drywall should not qualify as damages "because of" property damage.  Its reasoning, however, is not clear.  In fact, its contention ignores the plain language of the policy, which does not restrict coverage to costs of repairing property damage, but rather extends coverage for all damages *because of* property damage.  It does not matter that the 12 units at issue did not contain CDW and had not themselves been physically damaged.  "Loss of use" is explicitly defined to include loss of use of property which has not been physically injured (see p. 8 above).  What is more, when economic losses are a measure the physical injury to the tangible property, those losses fall under the scope of coverage.  *Geddes; Hendrickson; Centillium v. Atl. Mut. Ins. Co.*, *supra*.

An insurance industry disseminated example of covered loss of use damages is instructive.  If a crane falls and blocks access to a store, the store's claim for loss of business is covered even though the store itself suffered no physical injury.  See e.g., Peter J. Kalis, Thomas M. Reiter, and James R. Segerdahl, Policyholder's Guide to Insurance Coverage, § 7.01[B], 7-11 (2008) citing *Eljer Mfg. v. Liberty Mut. Ins. Co.*, 972 F.2d 805, 810 (7th Cir. Ill. 1992) citing Society of Chartered Property and Casualty Underwriters, 1973 CGL Changes 9 (1971); Fred L. Bardenwerper & Donald J. Hirsch, General Liability Insurance--1973 Revisions 11, 32 (Defense Research Institute, Inc. 1974); Guide to Liability Insurance 4 (Rough Notes Co. 1973).  As noted, the policies explicitly define "property damage" to include "loss of use" and define "loss of use" to include property that has not been physically injured.  That is the coverage provided.  The damages at issue here certainly fall as easily within the framework as the store owner's loss of business in the insurance industry provided example set forth above.

The additional case law relied upon by Westchester does not change this result.  In *Silgan Containers, LLC v National Union Fire Ins. Co. of Pittsburgh, PA,* No. C-09-5971-RS, 2011 WL

18

4551467 (N.D. Cal. Oct. 3, 2011), like the stand alone and purely economic damages cases discussed above, there were no allegations of physical injury to the food product – just the speculation that it could have caused damage.  On this point alone, *Silgan* is distinguishable.

Equally distinguishable is *National Union Fire Ins. Co. of Pittsburgh PA v. Ready Pac Foods*, 782 F. Supp. 2d 1047 (C.D. Cal. 2011).  *Ready Pac* involved damages arising from an E. Coli outbreak at certain Taco Bell restaurants linked to Ready Pac-supplied shredded lettuce. The court ruled that lost profits from the alleged decline in patronage at restaurants where there was no E coli outbreak, and were never shut down, did not constitute covered losses.  In contrast here, the units sold are in the same building (and sometimes on the same floor) as the affected units and elevator lobbies.  On these facts, *Ready Pac*, like *Silgan Containers*, is readily distinguishable.[4]

### C.    Coverage is Available for Damages Incurred to Mitigate "Property Damage"

Finally, it is well settled in California, as well as jurisdictions around the country, that costs incurred to mitigate further property damage are covered under a CGL policy like that at issue here. *See* Peninsula II's Damages Motion at 18-19 and the case law discussed therein including, *Globe Indemnity Co. v. The State of Calif.*, 43 Cal. App. 3d 745 (1974);  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1565-66 (9th Cir. 1991) ("[W]here an insured is covered for damage to a third party's property, that insured would reasonably expect coverage for efforts to mitigate that damage."); *Aerojet-General Corp. v. Superior Court*, 211 Cal. App. 3d 216, 227 (Cal. App. 1989) ("A rule, reasonably applied, permitting expenses incurred in the mitigation of damages to tangible property to be recoverable under policies insuring against

---

[4]   Notably, the *Ready Pac* court certified this issue for immediate appeal and stayed the action pending Taco Bell's anticipated appeal.  *Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Ready Pac Foods, Inc.*, 2011 U.S. Dist. LEXIS 54100 (C.D. Cal. May 9, 2011).

liability incurred because of damages to tangible property would seem to require universal application as it encourages a most salutary course of conduct."). *See also*, *Geddes II*, 63 Cal. 2d. 602, 605 ("The policy of the courts has been to promote mitigation of damages").

Notably, the *Ready Pac* court's rationale, in part, was that the lost profits were not economic expenditures incurred in mitigating damages as a result of the E coli outbreak. *Id*. at 1056. Here, it is just the opposite. In 2009 Peninsula II discovered widespread physical injury throughout the building and, in an effort to prevent further property damage and future losses, incurred costs to remove the drywall from the Condominium. (PD SOF #8-11). Had the CDW not been removed in its entirety, property damage would have continued to increase and Peninsula II's (indeed, all three insured's) monetary losses would have skyrocketed. In a similar vein, had Peninsula II not undertaken the bulk sale, it could not have continued to stay afloat and repair the building. Peninsula II's costs to mitigate future property damage insured by the Westchester Policy are covered.

## IV. CONCLUSION

For the foregoing reasons, Defendant/Third Party Plaintiff Peninsula II respectfully requests that Westchester's Motion for Summary Judgment Against All plaintiffs On Certain Categories of Alleged Property Damage be denied in its entirety.


Dated: February 3, 2012                    Respectfully submitted,

                                           By:   /s/ Eric C. Edison

                                           JAMES W. CARPENTER, ESQ.
                                           Florida Bar No.: 654256
                                           ERIC C. EDISON, ESQ.
                                           Florida Bar No. 010379

                                           ANGELO & BANTA, PA.
                                           SunTrust Center, Suite 850

515 East Las Olas Blvd.
Fort Lauderdale, FL  33301
Telephone:  954-766-9930
Facsimile:  954-766-9937
Email:  jwc@angelolaw.com
Email:  ece@angelolaw.com

and

DAVID T. DEKKER, ESQ. (admitted *pro hac vice*)
MELISSA C. LESMES (admitted *pro hac vice*)
MICHAEL S. MCNAMARA (admitted *pro hac vice*)

PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street
Washington, D.C. 20037
Telephone:  202.663.8000
Facsimile:  202.663.8007
Email:  david.dekker@pillsburylaw.com
Email:  melissa.lesmes@pillsburylaw.com
Email:  michael.mcnamara@pillsburylaw.com

*Attorneys for Peninsula II Developers, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2012, I electronically filed a copy of the forgoing with via the CM/ECF system.

By: /s Eric C. Edison
       JAMES W. CARPENTER, ESQ.
       Florida Bar No.: 654256
       ERIC C. EDISON, ESQ.
       Florida Bar No. 010379