**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-CV-23691-SEITZ-SIMONTON**

PENINSULA II DEVELOPERS, INC., a Florida
corporation; GRYPHON CONSTRUCTION
COMPANY, a Florida limited liability company;
and SKYLINE SYSTEMS, INC., a Florida corporation,

        Plaintiffs,

    v.

WESTCHESTER FIRE INSURANCE COMPANY, a
New York corporation, and LANDMARK AMERICAN
INSURANCE COMPANY, an Oklahoma corporation,

        Defendants.

_____/

**PENINSULA II DEVELOPER INC.'S OPPOSITION TO
WESTCHESTER FIRE INSURANCE COMPANY'S MOTION FOR SUMMARY
JUDGMENT AGAINST PLAINTIFF PENINSULA II DEVELOPERS, INC.**

    Peninsula II Developers, Inc. ("Peninsula II"), submits this memorandum of law in opposition to Defendant Westchester Fire Insurance Company's ("Westchester") Motion for Summary Judgment Against Plaintiff Peninsula II Developers Inc.

**I.    INTRODUCTION**

    This insurance coverage action began more than two years ago when American Home Assurance Company ("American Home"), which issued the primary layer of general liability coverage under an Owner Controlled Insurance Program ("OCIP"), sought declaratory relief concerning its obligations with respect to property damage claims arising out of the existence of Chinese Drywall ("CDW") in a condominium project in Aventura, Florida. Peninsula II, the developer of the project, Gryphon Construction, the general contractor, and Skyline Systems, the drywall subcontractor who supplied and installed CDW, are all insureds under the policies issued

1

in connection with the OCIP. Because repair costs and damages were projected to be in excess of $20 million, Peninsula II, Gryphon and Skyline all brought third party complaints against the umbrella insurance carriers, Westchester and Landmark American Insurance Company.

In June 2011, after more than a year of litigation and with approximately half of the 180 affected condominium units repaired, American Home settled with its three insureds, paying out the primary layer's $4 million products/completed operations aggregate limit to Peninsula II on behalf of Skyline. This payment exhausted the primary layer policy limits and triggered Westchester's coverage obligations. Westchester disputes that the American Home policy has been exhausted and that its policy covers any of the claimed damages. Furthermore, Westchester argues that despite years of litigation, this Court cannot rule on many of the coverage issues because they are premature. Westchester's motion misses the mark.

In addition to seeking indemnity for the costs incurred to repair third party-owned units, common areas, and other third party-owned property, Peninsula II has made Section 558 claims and filed suit against both Gryphon and Skyline with respect to damages arising out of the CDW in connection with units it still owns (and was unable to sell because of CDW). Westchester insures Gryphon and Skyline as well as Peninsula II, and is responsible to indemnify them against liability to Peninsula II. That liability, however, need not be adjudicated in order for this Court to rule as a matter of law on the coverage issues presented. Indeed, it is well settled that the Court in a declaratory judgment action can rule on coverage issues where liability is contingent.

In particular, the issue of exhaustion of the primary policy limits does not turn on whether Gryphon and/or Skyline are judged liable for Peninsula II's damages. There is only one products/completed operations aggregate limit available under the primary layer of general

liability coverage in the OCIP, notwithstanding the fact that American Home issued three policies. American Home paid that limit. As such, the American Home policy has been exhausted and Westchester's obligations are triggered as a matter of law. Furthermore, it is undisputed that property damage occurred in 2009. As such, the basic insuring agreement and conditions of Westchester's policy have been satisfied, triggering Westchester's obligations with respect to additional products-completed operations losses. The undisputed facts establish that all of Peninsula II's damages fall under the PCOH and thus are expressly excepted from the Damage to Project or Jobsite Exclusion.

## II.    MATERIAL FACTS

The facts material to this motion are stated in the accompanying *Peninsula II's Response to Defendant Westchester Fire Insurance Company's Statement of Material Facts* and *Peninsula II's Statements of Material Fact in support of its Motion for Summary Judgment on Exhaustion of Primary Policy Limits and on the Inapplicability of Contractual Liability and Damage to Project or Jobsite Exclusions,*[1] which are incorporated herein by reference. The essential facts are as follows:

The Peninsula II Condominium Project was insured by an OCIP. Peninsula II, the developer, Gryphon, the general contractor, and Skyline, the drywall subcontractor, are all insureds under the OCIP. American Home provided the primary layer of coverage with per occurrence limits of $2 million and a products completed operations aggregate limit of $4 million for the project term plus a five year completed operations extension period or "tail."

---

[1]   References to Peninsula II's Response to Westchester's Statement of Facts are identified as "RWSOF #__."  References to Peninsula II's Statement of Facts in support of its Motion for Summary Judgment on Exhaustion are identified as "PEXH SOF #__."  References to Peninsula II's Statement of Facts in support of its Motion on Summary Judgment on the Inapplicability of Contractual Liability and Damage to Project or Jobsite Exclusions are identified as "PEXC SOF #___."   References to Peninsula II's Statement of Facts in support of its Motion on its Entitlement to Damages are identified as "PD SOF #____."

(PEXH SOF #18.)   Under the language of the policy and as understood by the broker who negotiated the coverage for Peninsula II, the single $4 million products completed operations aggregate limit applies to the project term and the tail.   (RWSOF # 54; PEXH SOF#28-33.) Westchester provided the first layer of umbrella coverage with limits of $25 million. Westchester's policy, with some relevant exceptions, follows the language of the American Home policy.   Westchester's policy is triggered upon the payment by American Home of its underlying limits.  (PEXH #18, 19.)

Construction of the Condominium began in 2005, and Peninsula II began closing units in August 2007.  (PEXH SOF# 8-10.)  Condominium documents were filed, transferring control of the base building and common elements to the Condominium Association on August 6, 2007. (RWSOF #19 ;31; 50.)  By January 16, 2009, Peninsula II had sold 92 of the 223 units.  (PD SOF# 28.)  In February 2009, unit owners at the Project began complaining of property damage arising out CDW.   (PEXH SOF #11).   For example, on February 23, 2009 the owner of Peninsula II Condominium Unit 2005 notified Peninsula II by letter pursuant to Fla. Stat. § 558.004(3) of alleged property damage to walls, ceilings, fixtures, electrical systems and the HVAC system from Chinese-sourced drywall.   The Chapter 558 Notice of Claim states as follows:

> My client closed on the purchase of Unit 2005 on or about November 2007.  *Recently,* distinct black stains *have begun to appear* on the walls and ceiling of the unit.  The fixtures have started to tarnish and a distinct smell can be detected inside the unit.  In addition, the electronic systems in the unit (including, but not limited to the HVAC system and the air ducts) have become coated with a dark substance.

(PEXH SOF #11.)  Peninsula II investigated the claims and ultimately determined that 181 of the 223 units, both inventory and third party owned, and certain common areas of the Condominium

contained CDW which was corroding certain metal components and causing other damages within the Condominium.  (PEXH SOF #14.)

Although property damage was evident from visual observation in 2009, none was observed during the construction of the Project.  Skyline's Daniel Moberg testified in deposition that Skyline was unaware of any problems associated with the CDW installed in the building until the first claims were made in early 2009:

> Q:  Do you know if anyone at Skyline detected anything wrong with the
>      drywall before complaints were received in terms of –
> A:  No.  I didn't find out anything until I got a phone call a year after the
>      job was done or more.
> Q:  No one smelled any odors?
> A:  No.  No one said anything to us.
> Q:  No one saw anything unusual about the drywall?
> A:  No. People walked by it every day.

(PEXH SOF #13.)   Gryphon's Lawrence Kibler similarly testified at deposition that he was unaware of any complaints about odors prior to the completion of construction at the building. (*Id*.)

American Home initially provided a defense to Peninsula II for the CDW claims and Westchester reserved its rights.  On December 11, 2009, however, American Home filed this action for Declaratory Judgment seeking a declaration that it owed no duty to defend or indemnify Peninsula or the other insureds, Gryphon and Skyline, with respect to the CDW claims.    Peninsula II, Gryphon and Skyline filed counterclaims against American Home and third party complaints against Westchester.  Westchester answered, denying coverage for the CDW claims.  (PEXH SOF #22).

After the OCIP carriers denied coverage, Peninsula II began to enter into Work Authorization Agreements with residents whereby Peninsula II agreed to repair the property

damage caused by the CDW.  Peninsula II also began to repair damage to the property owned by the Condominium Association, and connected to inventory units.  (Martinez Decl. ¶11).

As of February 1, 2012, over $25 million has been incurred to remediate damage by reason of the CDW.  (RWSOF#1.)  It is expected that when all the remedial work has been completed, Peninsula II will have incurred over $34 million in costs. (PEXH SOF #16)  This amount includes direct costs of repair, consultant costs, costs to relocate unit owners and/or tenants displaced during remediation to temporary housing, finance costs incurred by Peninsula II to carry units, which cannot be sold due to the presence of CDW, losses sustained by Peninsula II in an under market bulk sale of certain units that Peninsula II was forced to incur as a result of the CDW, and other losses. (*Id.*)

On June 2, 2011, American Home executed a settlement agreement under which American Home paid Peninsula II $1.6 million for defense costs incurred through June 2, 2011, and its $4 million products completed operations limit for CDW property damage claims on behalf of Skyline. (PEXH SOF #23.)  Westchester has long taken the position that property damage taking place after drywall completion in each unit, but before overall building completion, gives rise to a completed operations claim with respect to Skyline.  Specifically, in Westchester's Answers to Interrogatories, Westchester states:

> In this regard, keep in mind that once Skyline has installed the drywall in a given unit, related property damage taking place thereafter but before overall building or unit completion would be a completed operation with respect to Skyline. . . .

(PEXH SOF #25.)  Therefore, under the terms of the settlement agreement and the American Home policy, American Home's payment of $4 million on behalf of Skyline reflects a payment of its full products-completed operations aggregate limit, and thus exhausts its obligations in connection with CDW property damage claims at the Project.  (*Id.* at #24).

## III.   ARGUMENT

### A.   This Court Has the Authority to Rule on the Coverage Issues Presented in this Declaratory Judgment Action.

As Peninsula II understands its position, Westchester concedes that Peninsula II's claim for coverage of costs it incurred to resolve claims of third party unit owners and the Condominium Association are ripe for determination, but the Court should not rule on the coverage issues arising from Peninsula II's own claims over against Gryphon and Skyline. Westchester's assertion that deciding any coverage issues arising out of Peninsula II's damages claims against Gryphon and Skyline is premature, without a full and final determination of Gryphon's and Skyline's liability, is effectively an invitation to declare much of the nearly two years spent actively litigating this case a waste of valuable time and resources. The Court should decline this invitation. Notably, Westchester waited to raise any issue of prematurity until after the Court rejected its position that Florida law applied to coverage issues, nearly a year to the day after Westchester answered Peninsula II's Third Party Complaint.

The Eleventh Circuit has made clear that in insurance cases like this, the fact that liability may be contingent will not defeat jurisdiction of a declaratory judgment action or otherwise limit this Court's ability to rule on the relevant coverage issues. *GTE Directories Publishing Corp. v. Trimen America, Inc.* 67 F.3d 1563, 1569 (11th Cir. 1995); *see also Am. Ins. Co. v. Evercare C*o., 2011 U.S. App. LEXIS 12188 (11th Cir. June 15, 2011) (affirming district court's jurisdiction over declaratory judgment action where "[an insurer] denied coverage and [an insured] has demanded it" because "[t]hat is a controversy and thus there is jurisdiction."). Florida courts interpret Florida's declaratory judgment statutes in much the same way, recognizing the value of determining coverage issues, even an insurer's duty to indemnify, before resolution of an underlying claim is final. *Higgins v. State Farm Fire & Cas. Co.*, 894 So. 2d 5, 17-18 (Fla.

2004) (trial courts should give weight to whether proceeding to a decision as to the insurance indemnity issue will promote settlement as a factor in determining whether an insurance indemnity coverage issue should proceed ahead of the underlying action.); s*ee also Britamco Underwriters v. Central Jersey Invs*., 632 So. 2d 138, 141 (Fla. 4th Dist. Ct. App. 1994) ("The better part of wisdom should have dictated to [the insurer] resolution of the question of its liability to the insured under the claimed renewal of the policy by the simple expedient of a declaratory judgment proceeding, at the inception of the litigation.")

Like the Eleventh Circuit, the Ninth Circuit has held that a court can render a coverage determination in a declaratory judgment action even when the underlying liability action has not yet proceeded to judgment. *See American States Ins. Co. v. Kearns*, 15 F.3d 142, 144 (9th Cir. 1994).   And, California law also makes clear that this Court can decide coverage issues in a declaratory judgment action. *See Nat'l Union Fire Ins. Co. v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1053 (C.D. Cal. 2011) (the Court need not have determined the insured's liability "to determine whether [the insured's] potential liability under the [claim] would be covered through the underlying" insurance policy).  Westchester's reliance on California case law outside of the declaratory judgment context is not illustrative.  *See* Westchester Mem. (DE 282) at 4 n.6. citing *McKee v. Nat'l Union Fire Ins. Co. of Pittsburgh PA*, 15 Cal. App. 4th 282 (Ct. App. 2d Dist. 1993) (judgment creditor sued judgment debtor's insurer before appeal); *Coleman v. Gulf Ins. Group*, 41 Cal. 3d 782 (1986) (judgment creditor has no cause of action for meritless appeal or common law bad faith); *Murphy v. Allstate Ins. Co*., 17 Cal. 3d 937 (1976) (failure to settle within policy limits).

Fla. Stat. § 627.4136 and the case law applying that statute, referenced in Westchester's moving papers, do not change this result.[2]  Indeed, § 627.4136 does not apply here at all. As specified by the Florida legislature, Chapter 627 and its sections do not apply to policies not issued in the state of Florida:  "No provision of this part of this chapter applies to:  (2)Policies or contracts not issued for delivery in this state nor delivered in this state, except as otherwise provided in this code."  Fla. Stat § 627.401.  As this Court found over a year ago, the policies at issue here were issued and delivered in California.  See DE 115.  As such, section 627.4136 is inapplicable.  *See Prime Ins. Syndicate v. BJ Handley Trucking, Inc.*, 363 F.3d 1089, 1091-1092 (11th Cir. 2004).

Even if the statute was relevant, however, it only precludes a non-insured from making a claim for coverage under another party's liability policy.  Here, Peninsula II, Gryphon and Skyline – that is, all the parties seeking coverage here – are insureds under the Westchester policy.  Accordingly, the statute does not apply.  *See Tindall v. Travelers Indem. Co*., 613 So. 2d 1369 (Fla. 2d Dist. Ct. App. 1993).

Practical considerations also support the Court ruling on the coverage issues presented. Peninsula II has incurred actual damages well into Westchester's coverage layer resolving third-party claims, including claims for damage to third party owned units at the Project, damage to Condominium Association owned property, and costs to relocate unit owners.  There is clearly no impediment to the Court ruling on coverage issues related to these damages, and to the extent they raise material issues of fact, they are ready for trial.

---

[2]  *See* Westchester Mem. at 4 n.7 citing *Colony Ins. Co. v. Total Contracting & Roofing, Inc*., No. 10-23091-CV, 2010 WL 5093663 (S.D. Fla. Dec. 8, 2010); *VanBibber v. Hartford Accident Indem. Ins. Co*., 439 So. 2d 880 (Fla. 1983); *Hazen v. Allstate Ins. Co.*, 982 So. 2d 531 (Fla. 2d DCA 2007); *Allstate Ins. Co. v. Stanley*, 282 F. Sup. 2d 1342 (M.D. Fla. 2003).  In none of these cases did the court address the issue of where the subject policy was issued.

Notably, Westchester has grossly overstated the amount of property within the building that is owned by Peninsula II rather than the Condominium Association.  While this Court need not precisely differentiate that ownership here, suffice it to say that the Condominium Association, not Peninsula II, owns the interstitial spaces of the building behind the walls and other property in close proximity to individual units.  (RWSOF # 19, 31, 50.)  In short, a substantial amount of property that Westchester suggests is owned by Peninsula II, because of its proximity to inventory units, is in fact third-party property owned by the Condominium Association.  Peninsula II notes this both to avoid any suggestion that it has failed to preserve its position, and to emphasize the inefficiency of attempting to segregate the coverage issues between those which are ripe, and those which are not.

Peninsula II has also incurred certain damages that it acknowledges it does not have coverage for as an insured under the Westchester policy; only as a judgment creditor.  Plaintiffs Gryphon and Skyline, however, do have coverage for those damages as insureds.  Under *GTE*, as well as California and Florida law, there is no impediment to the court making rulings as to Gryphon and Skyline's coverage for their potential liability for these damages.  Indeed, many of the same coverage issues, and the very same policy language, are at issue with respect to all of the damages.

Furthermore, absent a ruling on these issues now, the possibility of a prompt, complete resolution of this matter will essentially evaporate.  This case has been in litigation since late 2009.  The parties have argued choice-of-law, exchanged tens of thousands of pages of documents, deposed numerous witnesses, prepared expert reports and mediated twice.  What is precluding the possibility of settlement is the divergent views on these issues.  To delay resolution of these issues will not only further prolong this case, making settlement virtually

impossible prior to trial on the issues which are ripe here, but will ensure that the parallel state court liability action is not resolved.  In the interest of judicial economy, the coverage issues should be – and can be – decided as a matter of law now.  As the Florida Supreme Court in *Higgins* aptly observed, "[i]n respect to settlements, all parties are in a better position to enter into settlement negotiations when the decision as to coverage has been put to rest."  894 So. 2d at 17.

Lastly, Westchester recites a long laundry list of defenses its newly appointed counsel has raised on behalf of Gryphon and Skyline in Peninsula II's state court action.  It suggests that in light of these defenses, the Court should not rule upon the coverage issues here.  We disagree. While Peninsula II vigorously disputes their viability, these state court defenses are irrelevant to the issues here.  Whether any of those defenses limit Gryphon's or Skyline's liability will be decided by the state court.  This Court need not consider the merits of these defenses in order to rule on the coverage issues that are at issue.  Westchester's reliance on these defenses in this motion is simply a red-herring, so Peninsula II will not address them here.

**B.   American Home's Payment of the $4 million PCOH Aggregate Exhausts the Primary Policy's Limits for the Claimed Damages.**

As addressed in detail in Peninsula II's *Motion for Summary Judgment on the Issue of Exhaustion of Primary Policy Limits* ("Peninsula II's Exhaustion Motion") (DE 292), incorporated herein by reference, under the clear and unambiguous language of both the American Home and Westchester policies, the products-completed operations aggregate applies one time for the project, including the completed operations extension.  Significantly, the limits of the OCIP policies apply jointly to all insureds.  And, while "products" and "completed operations" claims are distinct, the American Home primary layer of coverage includes an aggregate limit for products and completed operations claims together.  An aggregate limit is the

total amount that a carrier will pay for all claims of a certain type regardless of the total number of claims asserted or the total liability of the insureds.  Once the aggregate limit of a primary layer of coverage is exhausted, it is exhausted as to all insureds.  Peninsula II, Gryphon and Skyline settled with American Home in reliance on Westchester's repeatedly stated position that the claims were completed operations with respect to Skyline.  (RWSOF #56.)   In other words, the American Home policy provides only $4 million in coverage for products completed operations claims for as long as the policy applies.  Once that $4 million is paid, American Home's products completed operations coverage is exhausted and Westchester's coverage obligations come into play.

Westchester argues that there are multiple occurrences here in an attempt to suggest that there is additional coverage available under the American Home policy and to defer Westchester's obligations.  Whether there are two occurrences or 182 occurrences, however, the maximum amount of loss payable by American Home under the products completed operations aggregate is $4 million.  Therefore, the number of occurrences is irrelevant. As Westchester's underwriter testified at deposition, "If [American Home] paid $4 million for products/completed operations, their policy would be exhausted."  (PEXH SOF # 34.)  He did not qualify the statement by conditioning it on the number of occurrences.  It is a simple application of the excess policy language: When the aggregate limit of the primary policy is paid, the primary policy is exhausted.  American Home paid that aggregate limit for products and completed operations coverage, so the primary layer is exhausted.

Furthermore, Westchester's position that there is more than one products completed operations aggregate limit is belied not only by the language of the policy, the language of the binder confirming coverage, and the testimony of the Westchester underwriter, but also by the

broker who placed the coverage.  This issue is addressed in detail in Peninsula II's Exhaustion Motion (DE 292), so we will not repeat those arguments here, but instead incorporate that motion by reference.

Thus, whether the products-completed operation aggregate is allocated to the period when Skyline completed the drywall work in all units (the 2006-2007 policy period), or, when the temporary certificates of occupancy were issued for all units (the 2007-2008 policy period), or during the completed operations tail, or any time in between, is of no consequence to Westchester's coverage obligations.  As such, Westchester's argument that the American Home policy has not been exhausted cannot be found as a matter of law.

### C.   All of the Damages Incurred by Peninsula II Fall Within the PCOH Exception to the Damage to Job Site Exclusion.

Nor can this Court find as a matter of law that the Damage to Jobsite Exclusion applies to defeat coverage in the event the American Home policy has been exhausted.  As addressed in detail in Peninsula II's *Motion for Summary Judgment on the Inapplicability of the Contractual Liability and Damage to Project or Jobsite Exclusion* ("Peninsula II's Exclusion Motion") (DE 293) incorporated herein by reference, Westchester's argument concerning the applicability of the  Damage to Project or Jobsite Exclusion is misplaced. Specifically, the damage to project or job site exclusion precludes coverage for damage that occurs at the job site and during construction, but provides coverage for property damage that falls within the "products-completed operations hazard." The American Home policy defines the "products-completed operations hazard" as:

(a)    . . . all "bodily injury" and "property damage" occurring away from premises you own or rent[3] and arising out of "your product" or "your work"[4] except

(1)    Products that are still in your physical possession; or

(2)    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(i)    When all of the work called for in your contract has been completed.

(ii)   When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(iii)  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(PEXC SOF #29.)   In other words, the exception to the exclusion preserves coverage for property damage that occurs as a result of products not in the insured's possession and/or after work has been completed.   Coverage for completed operations claims was extended by endorsement under the OCIP for five years commencing when the project is complete or the first temporary certificate of occupancy is issued. (PEXH SOF#18.)

---

[3]  Notably, under the American Home Completed Operations Extension Endorsement, extended completed operations coverage is afforded to Peninsula II.  The Endorsement provides that "Coverage provided under this extension applies to the owner of the project [Peninsula II] notwithstanding paragraph a. of the definition of the products-completed operations hazard."  (Westchester Ex. 12, pg. 48 of 61.)  The Westchester policy follows American Home on this point.  (PEXH SOF #19.)

[4]  "Your product" "(a) means (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by (a) You … and (b) includes (1) Warranties or representations made at any time with respect to fitness, quality, durability, performance or use of "your product". . . ." (Ex. 13, pg. 19 of 61.) Similarly, "Your work" "(a) means (1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations; and (b) includes (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work' . . . ."  (West. Ex. 12, pg. 20 of 61.)

The Condominium Declaration and Condominium Association documents were filed on August 6, 2007, transferring control of the base building and common elements to the Condominium Association.  RWSOF #19, 31, 50.  The first TCO was issued on August 7, 2007. The City of Aventura issued a certificate of occupancy for the building in April 2008.  Property damage was first detected and claims were first made in early 2009 -- over 18 months after the installation of drywall at the Project and nearly a year after the entire Project was completed. Under the plain terms of the policies and the undisputed facts, the property damage at issue falls within both prongs of the products/completed operations hazard, either (1) as damage arising from a product not in Peninsula II's possession, and/or (2) as a completed operations claim. Indeed, Westchester has long taken the position that property damage taking place after drywall completion in each unit, but before overall building completion, gives rise to a completed operations claim with respect to Skyline.  (PEXH SOF #25.)

Faced, however, with the prospect that its coverage is triggered based on American Homes' payment of the products completed operations aggregate limit, Westchester now takes the position that under the American Home Continuous or Progressive Property Damage Endorsement, progressive losses in connection with each individual are deemed to be one occurrence, and losses are deemed to occur only when that property damage first commences. As such, Westchester argues that the record facts that the property damage at issue here occurred in early 2009 can somehow be disregarded and that Peninsula II must prove when property damage "first occurred."  In other words, Westchester suggests that Peninsula II is obligated to prove a negative – that is, that the property damage did not first occur within the jobsite exclusion, even though there is no record evidence of property damage occurring prior to 2009. Neither the policy language nor the case law Westchester relies upon require this result.

In both *Montrose Chem. Corp. v Admiral Ins. Co.,* 10 Cal. 4th 645 (1995) and *Bayley Construction v. American Guarantee and Liability Ins. Co*, 010 WL 4272454 *2-3 (W.D. Wash. Oct. 15, 2010), the record evidence established that the property damage commenced (and thereafter continued) prior to the effective policy periods.  Here, coverage was in place for the project term, plus the five year completed operations tail.  There is no such evidence that property damage occurred outside of the policy period.  After the first complaints of corroded metals and foul smells were reported in 2009, Peninsula II undertook an investigation, and eventually determined that 181 of the 223 units, as well as numerous elevator lobbies had property damage from CDW.  Peninsula II is not required to "prove" that the property damage did not first occur before it was first discovered in early 2009.

Significantly, there is no evidence in the record of property damage covered by the Westchester policy – meaning compensable physical damage to (or loss of use of) components of the Condominium other than the drywall itself – before early 2009.  Westchester certainly does not cite any.  Indeed, lacking any evidence of property damage before early 2009 (but faced with extensive evidence of property damage after that date), Westchester retreats to sleight of hand.  It argues that Peninsula II must somehow prove a negative – the absence of property damage before it turned the building over to the COA – to meet its burden of proof.  This makes no sense.  Peninsula II meets its burden by showing the existence of damages within the definition of the Products-Completed Operations hazard.

Westchester also seeks to overcome the existing factual record by citing the American Home progressive property damage endorsement, which states that in the event of  "continuing or progressive . . . "property damage" over any length of time, such . . . "property damage" shall be deemed to be one occurrence and shall be deemed to occur when such . . . "property damage"

first commenced."  (DE 282 at 9.)  First, Westchester ignores the language of the American Home endorsement that immediately follows, which states that this endorsement applies only to American Home, and does not relieve other insurers from their obligations for progressive property damage.  The endorsement provides:

> Nothing herein shall be interpreted to relieve any other insurer [Westchester] from obligations under policies issued to any insured which provide coverage for all or part of any continuing or progressive . . . "property damage."

(Westchester Ex. 12, at 45 of 61.)  In other words, the American Home progressive property damage endorsement cannot relieve Westchester from any coverage obligations it has for progressive losses.  That is precisely, however, what Westchester seeks to do here.

Second, even if the endorsement did apply to Westchester, the undisputed factual record is still that the first "property damage" incepted in early 2009, clearly within the completed operations hazard.  (PEXH SOF #11-13).  On this record, Westchester cannot use the American Home progressive loss endorsement to funnel all of the property damage at issue into a time period for which Westchester claims there is no coverage.  Nor does the endorsement somehow eliminate coverage for products claims, which are not dependent upon date of inception.   In short, the American Home endorsement provides no comfort to Westchester.

### D.    Defense Costs Are Recoverable

Peninsula II is not seeking to recover from Westchester defense costs paid by American Home.  Specifically, American Home paid $1.6 million in defense costs to Peninsula II, and accordingly Peninsula II has withdrawn from its damages summary defense costs incurred through June 2, 2011, the date of the American Home settlement.  This amount includes certain costs incurred for ATC Associates, Inc, Applied Technical Services, Inc, Delta Consulting Group, Inc., Environ, Sage Ventures, Angelo & Banta, Carlton Fields, and Daniels Kashtan

Downs.  It does, however, seek defense costs incurred after American Home's policy exhausted, as afforded under the plain language of the Westchester policy.

Specifically, the policy provides coverage for defense costs under Condition F which provides:

> F. Expenses.  Loss and legal expenses incurred by the insured with the consent to the company in the investigation or defense of claims, including court costs and interest, shall be borne by both the company and the insured in the proportion that each party's share of loss bears to the total amount of such loss.  Salaries and expenses of the insured's employees shall not be considered as part of the above expenses.

(Westchester Ex. 11 at 26.)   Indeed, Westchester's William Schmaltz agreed.   *See Schmaltz Depo* 54:5-10 ("If [American Home has] paid, I believe their duty to defend ends, and then at that point the insured needs to defend themselves, and we'll pay expenses or we will - - will work with them."); 61:5-7 ("we would be responsible for some percentage of the defense costs if our policy was responding to the loss, yes.")  (RWSOF # 60.)  As set forth above, American Home's policy limits were exhausted on June 2, 2011.  From that point forward, Westchester's obligation under the above referenced provision is triggered.

The Westchester policy also provides that Westchester agrees to "pay on behalf of the insured for that amount of loss which exceeds the amount of loss payable by [American Home.]" RWSOF # 3.  Under the American Home policies, once American Home exhausts the underlying coverage it is no longer liable for defense costs.  Therefore, under the plain language of the Westchester policy, Westchester is liable to pay on Peninsula II's behalf all loss in excess of American Home's obligation, including defense costs.  Nothing in the Westchester policy excludes defense costs from the definition of "loss."  Thus, defense costs also reflect "losses" that Westchester has an obligation to pay on behalf of Peninsula II once American Home's policy exhausts.

With regard to amounts paid to Matco Services ("Matco"), SDM Engineers ("SDM"), and Wiss Janney Elstner ("WJE"), Peninsula II disagrees that all of these costs are "defense costs." *See Stearman v. Centex*, 78 Cal App. 4th 611 (Cal. Ct. App. 2000) (reporting that the "cost of repair is the proper measure of damages in a construction defect case," and affirming award of the costs for experts "who investigated the problems in order to formulate an appropriate repair plan" as part of the cost of repair).   The vast majority of the work that Matco and WJE performed, including nearly all of their work since August 2010, was for repair and remediation. *Id*.   For example, Peninsula II hired Matco, a corrosion consultant, to perform post-demolition inspections of metal components within affected units.   After the demolition of each affected unit, Matco personnel inspect the now exposed copper piping, galvanized steel studs, and galvanized steel conduit (which houses electrical wiring) to determine whether these elements have been adversely affected by the corrosive environment produced by CDW.   (PD SOF#25; RWSOF # 61.)   WJE oversees the remediation process and ensure its compliance with the protocol and standards, which includes periodic in-unit observations subsequent to the removal of drywall, tracking the progress of the repair project, and preparing final reports certifying proper completion of the work.   Peninsula II also retained SDM to test the wiring in each unit to ensure that after the corroded wiring ends have been clipped, the wiring has not been compromised. (*Id*.)   Peninsula II disputes that services provided to assist in the repair of units are "defense" costs.

While both Matco and WJE were retained by Peninsula II initially to investigate the nature and cause of the damages and perform testing, Peninsula II does not seek the costs of that initial investigatory work here.   Those costs have been reimbursed by American Home as defense costs.   Rather, the costs of these consultants are directly related and limited to costs

incurred in connection with the repair of the damaged property.  (*Id*.) At a minimum, there is a dispute of fact about whether any particular amount of the Matco or WJE costs are defense cost or repair costs, which cannot be resolved on summary judgment.

### E. Breach of Contract

Peninsula II added a breach of contract count to its Amended Complaint because as an insured it has incurred more than $4 million in damages to resolve third-party claims for property damage.  (DE 250.)  Having paid out an amount in excess of American Home's limits for third party liability, damages that are ripe for this Court's consideration, Peninsula II is entitled to payment under the Westchester policy for amounts in excess of American Home's limits. Westchester has refused to honor any of its coverage obligations under the policy, and as such has breached its duties thereunder.  For the reasons stated above and in Peninsula II's affirmative motions, Westchester is not entitled to summary judgment on the breach of contract count.

## IV. CONCLUSION

For the foregoing reasons, Defendant/Third Party Plaintiff Peninsula II respectfully requests that Westchester's Motion for Summary Judgment be denied in its entirety.

Dated:  February 3, 2012    Respectfully submitted,

            By:  /s/ Eric C. Edison

            JAMES W. CARPENTER, ESQ.
            Florida Bar No.: 654256
            ERIC C. EDISON, ESQ.
            Florida Bar No. 010379

            ANGELO & BANTA, PA.
            SunTrust Center, Suite 850
            515 East Las Olas Blvd.
            Fort Lauderdale, FL  33301
            Telephone:  954-766-9930
            Facsimile:  954-766-9937
            Email:  jwc@angelolaw.com
            Email:  ece@angelolaw.com

            and

            DAVID T. DEKKER, ESQ. (admitted *pro hac vice*)
            MELISSA C. LESMES (admitted *pro hac vice*)
            MICHAEL S. MCNAMARA (admitted *pro hac vice*)

            PILLSBURY WINTHROP SHAW PITTMAN LLP
            2300 N Street
            Washington, D.C. 20037
            Telephone:  202.663.8000
            Facsimile:  202.663.8007
            Email:  david.dekker@pillsburylaw.com
            Email:  melissa.lesmes@pillsburylaw.com
            Email:  michael.mcnamara@pillsburylaw.com

            *Attorneys for Peninsula II Developers, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2012, I electronically filed a copy of the forgoing

with via the CM/ECF system.

By: /s Eric C. Edison_____
      JAMES W. CARPENTER, ESQ.
      Florida Bar No.: 654256
      ERIC C. EDISON, ESQ.
      Florida Bar No. 010379