**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 09-23691-CIV--SEITZ/SIMONTON

PENINSULA II DEVELOPERS, INC.,
*et al.*,

Plaintiffs.

v.

WESTCHESTER FIRE INSURANCE
COMPANY, *et al.*,

Defendants.

_________________________________/

**ORDER GRANTING IN PART DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT, STAYING AND CLOSING CASE**

THIS MATTER involves potential coverage under a commercial general liability policy for property damage caused by Chinese Drywall installed during the construction of a 223-unit luxury condominium in Aventura, Florida. The insureds in this case - the developer, contractor and subcontractor on the construction project - seek a declaratory judgment that the excess insurers will cover all of the property damages and expenses related to remediating the Chinese Drywall damage in the building.

Currently before the Court are ten motions for summary judgment filed by three of the four remaining parties in this case. Though the Local Rules forbid a party from filing more than one motion for summary judgment, the parties urged the Court to allow them to exceed the one motion limit suggesting that this case could be resolved through the filing of multiple summary judgment motions on discrete legal issues. The Court, against better judgment and long-standing policy, acquiesced without setting an upper-limit on the number of motions and only asked the

parties to "work together" to present "discrete legal issues" to the Court. Order, p. 2 [DE-248].

Unfortunately, the parties' submissions give new meaning to the old aphorism that no good deed shall go unpunished. Far from the discrete legal issues promised by counsel, the Court is left to wonder what arguments might have been left out of their "kitchen-sink" briefs. Prolix and overreaching, the briefs serve only to advance the ultimate goal of each party - minimizing or maximizing coverage under the policies. Moreover, what the parties portray as discrete legal issues are more aptly described as "wish lists" that each party hopes the Court might answer in their favor.

This Court is no more inclined to grant wishes than it is to render an advisory opinion based on hypothetical facts, which is exactly what the parties have requested of the Court. This case involves a declaratory judgment action on what coverage will be able *if* the insureds are liable for property damage to third parties. The underlying lawsuit where that liability is at issue remains pending and is not final. The Court believes that the better practice is to "decline to express legal opinions on academic theoreticals which might never come to pass."[1] For the following reasons, the Court will deny the motions for summary judgment (with one exception, namely, that portion of Peninsula II's motion for summary judgment that there is only one products-completed operations aggregate limit) and stay this case pending the resolution of the underlying liability action.

## I. FACTUAL BACKGROUND

The following facts are undisputed except where noted. This case arises out of the construction of a 223-unit luxury condominium in Aventura, Florida called the Peninsula II

---

[1] *See* Sec. III.A., *infra*.

Condominium (the "Project"). The developer of the Project, Peninsula II Developers, Inc. ("Peninsula II") entered into an agreement for the construction of the Project with a contractor, Gryphon Construction, LLC ("Gryphon"). Gryphon, in turn, entered into a subcontract with Skyline Systems, Inc. ("Skyline") to supply and install drywall in the units and common areas of the Project.

### A. The Policies

To insure the Project, Peninsula II set up an Owner Controlled Insurance Program ("OCIP"). Under the OCIP, American Home Assurance Company ("American Home") issued three primary commercial general liability policies for the construction of the Peninsula II Condominium, for three consecutive terms lasting between May 15, 2005 and March 30, 2008.[2] The terms of American Home's policies with Peninsula II, which are versions of the post–1986 standard-form CGL policy, are identical in all material respects. The policies read:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply....
>
> * * *
>
> b. This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
> (2) The "bodily injury" or "property damage" occurs during the policy period;....

[2] American Home's Primary Policies are CGL Policies Nos. GL 706-58-30, effective May 14, 2005, to May 15, 2006, GL 178-27-54, effective May 15, 2006, to May 15, 2007, and GL 161-68-52, effective May 15, 2007, to March 30, 2008.

[DE 295-13, p. 6 of 62]. The policies exclude "property damage" to property that must be restored, repaired or replaced because the insured's work "was incorrectly performed on it." *Id.* at p. 58 of 62.[3] That exclusion, however, does not apply to "property damage" included in the "products-completed operations hazard."[4] *Id.* at Sec. 2.l., p. 10 of 62.

The American Home policies have general aggregate limits of $4,000,000, products-completed operations ("PCOH") aggregate limits of $4,000,000, and per-occurrence limits of $2,000,000. The policies all contain an endorsement entitled "Completed Operations Extension" that provides in relevant part as follows:

> Completed Operations Coverage is extended for the project described in the above Schedule for a period of 5 years (Extended Completed Operations Period). The Extended Completed Operations Period will commence when that portion of the project is put to its intended use, or a temporary or permanent certificate of occupancy is issued. [ ] The Extended Completed Operations limit of insurance is $4,000,000 per project and in the aggregate for the term of the project including the Extended Completed Operations Period. Coverage provided under this extension applies to the owner of the project notwithstanding paragraph a. of the definition of the products-completed operations hazard.

[DE 295-13, p. 49 of 62]. Peninsula, Gryphon and Skyline are all "Named Insureds" under the policies.

Westchester Fire Insurance Company ("WFIC") provided excess liability insurance coverage for the Project under policy number MLW787560 001 for the period of May 15, 2005

---

[3] This section is amended by the Damage to Property Exclusion Endorsement found at p. 58 of 62 [DE 295-13].

[4] The "products-completion operations hazard" is defined in the policies as:

> a. [A]ll "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of ... "your work" except:
> (1) Products that are still in your physical possession; or
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
> (a) When all of the work called for in your contract has been completed.

to January 31, 2008.[5] The policy requires WFIC to pay on behalf of an insured "that amount of loss which exceeds the amount of loss payable" by American Home's policies. [DE 295-16, p. 3 of 31]. An amendment to Condition C, Loss Payable reflects that WFIC's liability will not attach until the insured has paid a loss in excess of American Home's policy "or after the insured's liability shall have been made certain by final judgment or by written agreement of the insured, the claimant and WFIC. The excess policy contains a limit in the amount of $25 million Products-Completed Operations Aggregate in excess of American Home's coverage. WFIC's policy extends coverage for five years in the same manner as American home's policy.[6]

### B. Construction of the Project

Gryphon, as general contractor, commenced construction of the Project in January 2005. During the construction of the Project, Skyline acquired drywall for use and installation in the Project, some or all of which was manufactured in China ("Chinese Drywall"), which was used and installed throughout much of the Project. Skyline began supplying and installing drywall in condominium units on the 3rd and 4th floors of the Project in mid-June 2006 and continued upward completing its work on the 31st floor by May 2007. The City of Aventura issued

---

*Id.*

[5] Landmark American Insurance Company ("Landmark") issued a second layer excess commercial general liability insurance policy to Peninsula II related to the Project in the amount of $25,000,000.00. All claims against Landmark have been stayed in this matter. *See* Order [DE-97].

[6] WFIC's policy also contains an endorsement entitled "Damage to Project Job Site Exclusion[,]" which provides:

> THIS POLICY DOES NOT COVER "PROPERTY DAMAGE" TO REAL OR PERSONAL PROPERTY WHICH IS LOCATED IN OR ON ANY PROJECT' OR JOB SITE TO WHICH THIS INSURANCE APPLIES.
>
> ....
>
> THIS EXCLUSION DOES NOT APPLY TO THE "PRODUCT-COMPLETED OPERATIONS HAZARD" AS DEFINED IN THE UNDERLYING POLICIES LISTED IN ITEM 5 OF THE DECLARATION OF THIS POLICY.

Temporary Certificates of Occupancy ("TCO") for every floor in 2007 with the final Certificate of Occupancy for the building issued on April 25, 2008.[7]

### C. CHINESE DRYWALL

Chinese Drywall emits sulfur and other gases that cause corrosion of metal surfaces. In early 2009, nearly one year after the certificate of occupancy for the Project was issued, Peninsula II began to receive questions and complaints from unit owners concerning foul odors and black corrosion in their units. Specifically, on or about February 23, 2009, the owner of Unit 2005 notified Peninsula II, by letter pursuant to Florida Statute § 558.004[8], of alleged property damage from Chinese Drywall to walls, ceilings, fixtures, electrical systems and the HVAC system. The Chapter 558 Notice of Claim ("558 Claim") states as follows:

> My client closed on the purchase of Unit 2005 on or about November 2007. Recently, distinct black stains have begun to appear on the walls and ceiling of the unit. The fixtures have started to tarnish and a distinct smell can be detected inside the unit. In addition, the electronic systems in the unit (including, but not limited to the HVAC system and the air ducts) have become coated with a dark substance.

SOF, ¶11 [DE 293-1]. On April 30, 2009, Peninsula II advised Gryphon of 45 additional 558 Claims it had received from the Peninsula II Condominium Association, Inc., as well as made

---

[DE 295-16, p. 28 of 31].

[7]The TCOs were issued as follows: on August 08, 2007 (for floors 2-15); on August 22, 2007 (for Floors 26-29); September 20, 2007 (for Units 1704-1709); October 10, 2007 (for Units 04-09 on floors 18-20); October 25, 2007 (for Units 04-09 on floors 16, 21-25); November 6, 2007 (for Units 201-202, 01-03 on floors 16-25); December 05, 2007 (for the 30th floor); and December 18, 2007 (for the 31st floor).

[8]In relevant part, Florida Stature § 558.004 provides:

> In actions brought alleging a construction defect, the claimant shall, at least 60 days before filing any action, or at least 120 days before filing an action involving an association representing more than 20 parcels, serve written notice of claim on the contractor, subcontractor, supplier, or design professional, as applicable, which notice shall refer to this chapter.

Fla. Stat. § 558.004. Pursuant to § 558.003, if a claimant files an action alleging a construction defect without first complying with § 558.004, "the action may not proceed until the claimant has complied with such requirements." Fla. Stat. § 558.003.

558 Claims for the 109 condominium units it owned.[9] Representatives of Gryphon and Skyline testified that they were unaware of any problems associated with the Chinese Drywall installed in the building until the first claims were made in early 2009. *Id.* at ¶13.[10]

Thereafter, Peninsula II hired consultants to evaluate the presence of Chinese Drywall throughout the Project. They concluded that at least 181 of the 223 units had affected drywall. In consultation with various experts, Peninsula II developed a comprehensive remediation protocol to repair the property. Peninsula II notified the OCIP carriers - American Home, Westchester and Landmark - as well as both Gryphon and Skyline, of the Chinese Drywall claims and demanded a defense and indemnification. After the OCIP carriers denied coverage, Peninsula II began to enter into "Work Authorization Agreements" with residents whereby Peninsula II agreed to repair property damage and remove and replace the Chinese Drywall. Peninsula II also commenced repairs to the property damage in its own inventory units and also repaired and replaced the Chinese Drywall located therein. The parties have incurred more than $21,000,000 in costs related to the Chinese Drywall, and Peninsula expects the total costs to

[9]The 558 Notice identified the following developer owned units: 301, 303, 401, 404, 406, 502, 503, 601, 603, 607, 609, 701, 702, 706, 707, 807, 809, 902, 904, 905, 908, 909, 1001, 1009, 1101, 1102, 1104, 1108, 1204, 1206, 1209, 1401, 1405, 1406, 1408, 1503, 1505, 1506, 1507, 1509, 1602, 1608, 1701, 1703, 1706, 1707, 1801, 1803, 1804, 1805, 1806, 1807, 1808, 1904, 2002, 2003, 2004, 2007, 2008, 2009, 2101, 2103, 2105, 2106, 2201, 2202, 2203, 2204, 2207, 2208, 2301, 2305, 2309, 2401, 2402, 2403, 2404, 2407, 2408, 2409, 2503, 2506, 2507, 2509, 2602, 2603, 2604, 2605, 2606, 2607, 2609, 2704, 2706, 2707, 2709, 2802, 2804, 2806, 2807, 2808, 2809, 2903, 2904, 2906, 2907, 3002, 3003, 3101 and 3103. The Notice identified the following purchaser owned units: 309, 409, 506, 508, 604, 704, 801, 806, 906, 1003, 1004, 1006, 1007, 1103, 1105, 1107, 1109, 1201, 1203, 1207, 1404, 1407, 1409, 1504, 1603, 1604, 1605, 1607, 1609, 1705, 1906, 2005, 2006, 2104, 2107, 2206, 2307, 2405, 2501, 2601, 2608, 2705, 2801, 2901 and 2905.

[10]WFIC disputes the conclusion the Court can draw from this testimony - that there was no property damage until 2009 - but does not dispute the representatives' testimony. WFIC's Resp. To SOF, ¶13 [DE-306].

exceed $34 million. A portion of the costs have been submitted to Steadfast Insurance Company under a Subguard Policy. Steadfast has paid more than $10 million pursuant to that policy. [11]

### D. LITIGATION

The Chinese Drywall at the Project has spawned litigation from Louisiana to South Florida. Condominium owners, individually and as purported class representatives, sued Gryphon for claims related to the use and installation of Chinese Drywall in the Project, which suits are pending in the U.S. District Court for the Eastern District of Louisiana as part of multi-district litigation presided over by Judge Eldon Fallon (*i.e.*, MDL Case No. 2047) (the "MDL Claims").[12]

American Home initially provided a defense for the Chinese Drywall claims and Westchester reserved its rights. However, American Home commenced the instant suit on December 11, 2009, by filing a single-count Complaint seeking a declaratory judgment that it did not owe a duty to defend or indemnify Peninsula II, Gryphon or Skyline. Peninsula II, Gryphon and Skyline filed counterclaims against American Home and filed Third-Party Complaints against WFIC and Landmark seeking a judgment declaring that WFIC and Landmark both owe a duty to indemnify under their policies with respect to the lawsuits and claims involving Chinese Drywall. On June 2, 2011, American Home executed a settlement agreement under which American Home agreed to pay Peninsula II $1.6 million for defense costs incurred through June 2, 2011, and to pay $4 million to Peninsula II. The agreement allocated the $4,000,000 to

---

[11] Peninsula and Gryphon both seek declaratory judgment involving issues related to Steadfast. *See, e.g.*, Mot., p. 3 [DE-307]. Gryphon's motion must be denied because it failed to introduce any evidence explain the nature or basis for the $381,979.59 Gryphon purportedly paid as the result of third party liability.

[12] Gryphon is a party to three (3) suits in the Eastern District of Louisiana; to wit, *Payton, et al. v. Knauf Gips KG, et al.*, Case No. 2009 CV 07628; *Wiltz, et al. v. Beijing New Bldg Materials Ltd Co., et al*, Case No. 2010

American Home policy No. GL 178-27-54 effective May 15, 2006, to May 15, 2007, and was paid to Peninsula "on behalf of Skyline in settlement of certain claims asserted by Peninsula arising from the existence of Chinese Drywall[.]" *See* Settlement Agreement, 2.c., Ex. 18 [DE 295-18]. The payment was purportedly made under the products-completed operations aggregate limit of that policy. *Id.* That agreement also provided that if a court determines that the $4,000,000 indemnity payment should be allocated to a different policy period, then the payment will be treated as applied to that different policy period. *Id.*

Following the settlement, the remaining parties filed amended pleadings, which reconfigured their positions in this litigation. Peninsula II, Gryphon and Skyline are now Plaintiffs and WFIC and Landmark are Defendants. Peninsula II and Skyline both filed three-count Amended Complaints asserting claims for declaratory relief under 28 U.S.C. § 2201, breach of contract and bad faith. Am. Compl., [DE-250, 253]. Gryphon's Amended Complaint asserts three claims against WFIC [claims for declaratory relief (duty to defend and duty to indemnify) and breach of contract] and three claims against Landmark [claims for declaratory relief (duty to defend and duty to indemnify) and breach of contract]. Am. Compl., [DE-254].

More recently, Peninsula II filed suit against Gryphon and Skyline in Miami-Dade County Circuit Court for claims related to the use and installation of Chinese Drywall in the Project. The matter is styled *Peninsula II Developers, Inc. vs. Gryphon Construction, LLC and Skyline Systems, Inc.*, Case No. 11-16038 CA 31. The parties have not advised the Court of the current status of that case, but a review of the docket in that case reflects that motions to dismiss have been pending for many months with a response to those motions only having been filed recently.

---

CV 361; and *Amato, et al v. Liberty Mut. Ins. Co., et al.*, Case No. 2010 CV 0932.

Peninsula II has asserted breach of contract, breach of warranty, negligence, contractual indemnification, common law indemnification and strict liability claims against Gryphon and Skyline. WFIC has elected to associate in the defense of Skyline and Gryphon in the state court case as well as the separate litigation against Gryphon in the Eastern District of Louisiana.

### E. Pending Motions

Currently before the Court are the following ten motions for summary judgment: (1) WFIC's Motion for Summary Judgment Against Peninsula II [DE-282]; (2) WFIC's Motion for Summary Judgment Against Gryphon Construction [DE-283]; (3) WFIC's Motion for Summary Judgment Against Skyline Systems [DE-284]; (4) WFIC's Motion for Summary Judgment Against All Plaintiffs [DE-285]; (5) Gryphon's Motion for Partial Summary Judgment as to Counts II and III as to Liability [DE-288]; (6) Gryphon's Motion for Partial Summary Judgment as to Counts II and III as to Liability [DE-289]; (7) Peninsula II's Motion for Summary Judgment on Exhaustion of Policy Limits [DE-292]; (8) Peninsula II's Motion for Summary Judgment on Inapplicability of Contractual Liability and Damage to Project or Job Site Exclusions [DE-293]; (9) Peninsula II's Motion for Summary Judgment on Regarding the Effect of Payments Made Under Subguard on Westchester's Coverage Obligations [DE-294]; and (10) Peninsula II's Motion for Summary Judgment on its Entitlement to Damages [DE-296].

## II. Legal Standard

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Legal Analysis

### A. Abatement

Before the Court can even address the parties' widely-divergent positions, it must first address whether resolution of any issue is appropriate at this time. Spread across several of its filings, WFIC argues that the instant case is premature until the completion of the underlying state court case filed by Peninsula II against Gryphon and Skyline. WFIC relies on amended Condition C to the policy, which provides that actual payment, a judgment or a settlement is necessary before WFIC can have a duty to indemnify. Because there has been no payment, judgment or settlement in the state court case, WFIC believes this case is premature and it is entitled to summary judgment against all of the Plaintiffs. WFIC argues that to proceed with this case before the underlying case ends would result in the Court issuing advisory opinions on hypothetical issues.[13]

Peninsula II and Gryphon both disagree that the resolution of coverage issues in this matter

[13] WFIC also argues that Peninsula II has no standing to obtain a declaratory judgment as to claims for its own property damages. WFIC maintains that Peninsula II is a third party, not an insured, for those direct losses. Because third parties have no right to coverage declarations, WFIC argues Peninsula II has no standing to seek the relief it requests in the motions for summary judgment as to its own losses. Implicitly recognizing that it has no standing to seek a declaration of coverage as a third party, Peninsula II suggests that the "issues" involved in Peninsula II's direct losses are the same issues the Court will resolve for Peninsula II's claims as an insured. Pl.'s Mot., pp. 11-12 [DE-296]. While the issues might be similar, that does not alter the conclusion that Peninsula II, as a third party, has no right to seek a coverage declaration in this case.

is premature. They maintain that the Court can resolve the coverage issues before a final resolution of the underlying state court action. Relying on *GTE Directories Publishing Corp. V. Trimen America, Inc.*, 67 F.3d 1563, 1569 (11th Cir. 1995), they argue that contingent liability in an underlying action will not defeat jurisdiction of a declaratory judgment action. Pl.'s Mot., p. 11 [DE-296]. Peninsula II also argues that concluding that this case is premature effectively renders all of the parties work in this case useless. *Id.* at pp. 11-12 (the parties "have argued choice-of-law, exchanged thousands of pages of documents, deposed numerous witnesses and mediated twice.").

The parties' arguments miss the mark. Cases arising under the Declaratory Judgment Act present unique jurisdictional questions. The Act provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). "In all cases arising under the Declaratory Judgment Act, the threshold question is whether a justiciable controversy exists." *Atlanta Gas Light Co. v. Aetna Casualty and Surety Co.*, 68 F.3d 409, 414 (11th Cir. 1995). To the extent that WFIC means to suggest that it is entitled to summary judgment because this case is not ripe, the Court must reject any such suggestion. "In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (2006); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, (2007)("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."). Notwithstanding

WFIC's arguments, the Court concludes that the current matter satisfies the Supreme Court's articulation in *MedImmune* for finding an "actual controversy." *See MedImmune*, 549 U.S. at 127. The record reflects that, under all the circumstances, there is a substantial controversy between WFIC and the Plaintiffs and that their legal interests are adverse.

However, contrary to Peninsula II's suggestion, merely satisfying this threshold jurisdictional test does not necessitate that the Court exercise its jurisdiction. The Act has been characterized by the Supreme Court as " 'an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant.' " *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288. In other words, the Court's determination is discretionary, because the Declaratory Judgment Act is deliberately cast in terms of permissive, rather than mandatory, authority.

The question remains whether the Court should exercise jurisdiction and resolve the coverage issues or decline to exercise jurisdiction and abate this case to allow the underlying state court case to proceed to a final resolution. As one court in this district has correctly noted, whether to allow the underlying case to conclude first depends on whether "factual questions as to the specific liabilities of the parties must be answered before deciding the issues presented" in the declaratory judgment case. *Triple R Paving, Inc. v. Liberty Mutual Insurance Co.*, 510 F.Supp.2d 1090, 1093 (S.D. Fla. 2007). The Court believes that a number of factual issues will be decided in the underlying action of great import to this litigation including the timing and discovery of property damage on a unit by unit basis and whether Skyline incorrectly performed

its work.

As the Court referenced in the recent Order [DE-347] requiring additional briefing, whether Skyline incorrectly performed its work is a factual question of considerable significance here. WFIC's policy contains an endorsement entitled "Damage to Project or Jobsite Exclusion," which excludes from coverage "property damage"' to real or personal property located at the Project. [DE 291-1 1, p. 27 of 30]. WFIC's policy defines "property damage" in the same manner as the American Home policies. The endorsement further provides an exception to the exclusion such that the exclusion does not apply to the "PRODUCTS-COMPLETED OPERATIONS HAZARD"' as defined in the American Home policies. *Id.* The products-completed operations hazard in American Home's policy, however, is not a separately granted coverage.[14] [DE 295-13, p. 20 of 621]. Rather, it carves out an exception to an exclusion and is specifically invoked by an exclusion. Exclusion 2.j. specifically states that subparagraph (6)[15] does not apply to "property damage"' included in the "products-completed operations hazard." *Id* at p. 9 of 62. Moreover, exclusion 2.l. also specifically invokes the Products-Completed Operations coverage. *Id.* at 10 of 62.

Thus, the only "property damage"' that falls within the exception to WFIC's exclusion is "property damage"' that falls within the exception to exclusion 2.j. Stated differently, WFIC's policy will cover "property damage" to that particular part of any property that must be restored, repaired or replaced because Skyline's work was "incorrectly performed" and that "property

[14] *1777 Lafayette Partners v. Golden Gate Ins. Co.*, 2011 WL 1630089, at 85 (N.D.Cal., Apr. 29, 2011); *American Home Assur. Co. v. AGM Marine Contractors, Inc.*, 467 F.3d 810, 816 (1st. Cir. 2006).

[15] Subparagraph j.6. is amended by the endorsement found at DE 295-13, p. 58 of 62.

damage" falls within the definition of the "products-completed operations hazard."

The parties' submissions in response to the Court's Order identify allegations in the pleadings that might support a finding that the work was performed incorrectly.[16] *See* DE-348, 349 and 350. Undisputed evidence, however, not allegations, are necessary to carry the burden at this stage of the litigation. Because the Court believes this factual issue will be resolved in the underlying action, this also supports abatement of this action.

Moreover, where the posture of the liability case and the declaratory judgment action risk requiring the insured to adopt inconsistent factual positions, courts have concluded that abatement is appropriate. *Cf. American States Ins. Co. v. Dastar Corp.*, 318 F.3d 881, 890–91 (9th Cir. 2003) (trial court should stay a determination of the duty to indemnify prior to the resolution of the underlying case when an insurer attempts to place the insured in the conflicted position of being required to abandon its denial of liability in order to obtain coverage). Here, WFIC has accused both Gryphon and Skyline of attacking their own defenses in the underlying case to support their arguments for coverage in this case. In other words, Gryphon and Skyline's arguments here have effectively bolstered their own liability in the state court case, which is a scenario that abatement will prevent.[17]

The Court finds that abatement of the instant action to allow the underlying liability case to proceed to completion is consistent with the considerations of practicality and wise judicial administration. This result allows the Court to avoid issuing an advisory opinion on Gryphon

---

[16] The Court recognizes that Peninsula II disagrees with the Court's interpretation of how the Products-Completed Operations hazard comes into play, but Peninsula II also failed to discuss any of the authorities cited by the Court. Even assuming Peninsula II is correct, that would not alter the Court's decision to abate the case as other factual issues require resolution in the underlying matter.

[17] The Court disagrees with Peninsula II's assertion that allowing the underlying case to proceed before this case renders all of the parties work in this case useless. Any work performed in this case is equally applicable to the

and Skyline's future liabilities. As binding case law in this Circuit has noted, "it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass." *Am. Fid. & Cas. Co. v. Pa. Threshermen & Farmers' Mut. Cas. Ins. Co.*, 280 F.2d 453, 461 (5th Cir. 1960).[18] The Court believes that permitting the state case to resolve the liability question first will moot many of the issues identified by the parties in this case. More importantly, it allows this Court to presently "decline to express legal opinions on academic theoreticals which might never come to pass." *Id.* For these reasons, the Court will stay this case pending resolution of *Peninsula II Developers, Inc. vs. Gryphon Construction, LLC and Skyline Systems, Inc.*, Case No. 11-16038 CA 31.

While the Court finds that the case should be stayed pending completion of the underlying state case, the Court will address one[19] purely legal issue of California insurance policy interpretation that is critical to this case.

### B. California Law

The Court has previously concluded that California law governs this case. [DE-115]. Insurance policy interpretation under California law requires courts to initially look to the insurance policy language in order to ascertain its plain meaning. *United Nat'l Ins. Co. v.*

---

underlying lawsuit and this case when and if the parties return to this Court.

[18] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[19] The other discrete legal issue that the Court hoped to resolve involving California insurance policy interpretation relates to the scope of damages available for "property damage" under the policies. Because Peninsula II seeks damages beyond what is recoverable in California, the Court believed that a ruling on these issues would assist the parties in ultimately resolving this case. The problem, however, is a lack of evidence involving the scope of Chinese Drywall damage in this case. A ruling on the *type* of damages recoverable in a given case requires an understanding of the precise scope of damages at issue. The undisputed facts do not establish that 181 units suffered damage from Chinese Drywall, only that the 181 units contained Chinese Drywall. Specific information for the damage to each unit together with the discovery of that damage should be resolved in the underlying case.

*Spectrum Worldwide, Inc.*, 555 F.3d 772, 776 (9th Cir. 2009) (citing Cal. Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful")). As stated in California Civil Code § 1636, "[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." In evaluating the language of an agreement, the various provisions should be examined "together, so as to give effect to every part, if reasonably practicable." Cal. Civ. Code § 1641. "If a written policy provision is 'clear and explicit,' it must be given proper effect." *Spectrum Worldwide, Inc.*, 555 F.3d at 777 (citing *Fireman's Fund Ins. Co. v. Superior Court*, 65 Cal.App.4th 1205, 1211 (1997)).

If a policy provision is capable of two or more reasonable constructions, however, it is "ambiguous." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18 (1995). "[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy." *Bank of the W. v. Super. Ct.*, 2 Cal.4th 1254, 1265 (1992). If a court determines that two or more interpretations of a policy term are reasonable, it "must resolve the ambiguity in favor of the insured, consistent with the insured's reasonable expectations." *E.M.M.I. Inc. v. Zurich American Ins. Co.*, 32 Cal.4th 465, 473 (2004). "Furthermore, policy exclusions are strictly construed [ ], while exceptions to exclusions are broadly construed in favor of the insured." *Id.* at 471 (citations omitted).

### 1. Exhaustion of Policy Limits

Both Peninsula II and Gryphon argue that American Home's payment of the $4,000,000

products-completed operations aggregate limit exhausted the Completed Operations limit available under American Home's primary layer of insurance. *See, e.g.*, Pl.'s Mot. [DE-292]. They further argue that as a result of this payment, WFIC's excess policy is triggered. WFIC disagrees and argues that that excess policy has not been triggered. WFIC maintains that each of the three American Home policies are separate policies with separate products-completed operations aggregate limits and an additional extended operations limit. WFIC's Resp., p. 9 [DE-305]. Though WFIC is careful to point out that it is not arguing that American Home must pay $16,000,000 before WFIC's policy is triggered, it still maintains that the products-completed operations aggregate limits are separate requiring a determination of when the damage occurred to know which policy applies. Both parties maintain that the unambiguous policy language supports their respective positions. *See id.* at p. 11.

The Court agrees with Peninsula II on this issue and concludes that under the clear and unambiguous language of all the policies, the products-completed operations aggregate applies one time for the Project. Despite WFIC's efforts to create a disputed issue of fact through the testimony of its own witness,[20] a stranger to the insurance policy no less, the plain language of the policy reflects that only one aggregate limit for products-completed operations exists.

Looking to the plain language of the policy as required by the relevant California authorities,[21] *Spectrum Worldwide, Inc.*, 555 F.3d at 776, the policy provides that this "limit of insurance is $4 million per project and in the aggregate for the term of the project including the Extended Completed Operations Period." [DE 295-13, p. 49 of 62]. The Court finds this

---

[20] WFIC's lead underwriter initially conceded the position adopted by the Court herein, but later attempted to advocate a new position where there are three $4 million products completed operations aggregate limits as well as a distinct $4 million extension aggregate limit. *See* DE-305 at p. 10.

provision "clear and explicit," and capable of only one reasonable interpretation. *Spectrum Worldwide, Inc.*, 555 F.3d at 777. The unambiguous language at issue provides that the products-completed operations aggregate "is $4 million per project ... for the term of the project including" the extension period. [DE 295-13, p. 49 of 62]. This language is so straight forward and clear that the Court is at a loss to understand how the parties could disagree so vehemently over its interpretation. In any event, there is only one products-completed operations aggregate limit for the project in the amount of $4,000,000. Accordingly, and based on the foregoing, the Court finds that Peninsula II is entitled to summary judgment on the limited legal issue that there is only one products-completed operations aggregate limit available under the American Home policies.

## IV. CONCLUSION

Having carefully reviewed the parties' motions and given due consideration to practicality and wise judicial administration required in all cases, it is

ORDERED THAT

(1) This case is hereby STAYED pending the resolution of *Peninsula II Developers, Inc. vs. Gryphon Construction, LLC and Skyline Systems, Inc.,* Case No. 11-16038 CA 31. The Order setting the pretrial conference and trial for November 7, 2012, and January 13, 2013, respectively [DE-346], is hereby VACATED.

(2) WFIC's Motion for Summary Judgment Against Peninsula II [DE-282] is DENIED;

(3) WFIC's Motion for Summary Judgment Against Gryphon Construction [DE-283] is DENIED;

(4) WFIC's Motion for Summary Judgment Against Skyline Systems [DE-284] is DENIED;

(5) WFIC's Motion for Summary Judgment Against All Plaintiffs [DE-285] is DENIED;

---

[21] The Court declines the parties' invitation to review materials beyond the four corners of the policy.

(6) Gryphon's Motion for Partial Summary Judgment as to Counts II and III as to Liability [DE-288] is DENIED;

(7) Gryphon's Motion for Partial Summary Judgment as to Counts II and III as to Liability [DE-289] is DENIED;

(8) Peninsula II's Motion for Summary Judgment on Exhaustion of Policy Limits [DE-292] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that the Court finds that there is only one products-completed operations aggregate limit available under the American Home insurance policies. The motion is otherwise DENIED;

(9) Peninsula II's Motion for Summary Judgment on Inapplicability of Contractual Liability and Damage to Project or Job Site Exclusions [DE-293] is DENIED;

(10) Peninsula II's Motion for Summary Judgment on Regarding the Effect of Payments Made Under Subguard on Westchester's Coverage Obligations [DE-294] is DENIED;

(11) Peninsula II's Motion for Summary Judgment on the Entitlement to Damages [DE-296] is DENIED; and

(12) The parties' motions for oral argument [DE-339 and 351] are DENIED.

(13) This case is administratively CLOSED. The parties shall move to reopen the case within fourteen days of a judgment or a settlement in the state court case.

DONE and ORDERED in Miami, Florida this 22nd day of August, 2012.

Patricia A. Seitz

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record